```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                     CASE NO. 24-MJ-08441-RMM-1


UNITED STATES OF AMERICA              West Palm Beach, Florida
                                      September 23, 2024
          vs.

RYAN WESLEY ROUTH,

               Defendant(s).       Pages 1 - 130
    --------------------------------------------------------


                        DETENTION HEARING
               BEFORE THE HONORABLE RYON M. MCCABE
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:      MARK DISPOTO
                         ADAM MCMICHAEL
                         United States Attorney's Office
                         500 S. Australian Avenue
                         Suite 400
                         West Palm Beach, FL 33401
                         mark.dispoto@usdoj.gov
                         adam.mcmichael@usdoj.gov


FOR THE DEFENDANT(S):    KRISTY MILITELLO
                         Federal Public Defender's Office
                         250 S. Australian Avenue
                         Suite 400
                         West Palm Beach, FL 33401
                         kristy_militello@fd.org


                         RENEE SIHVOLA
                         Federal Public Defender's Office
                         109 North 2nd Street
                         Fort Pierce, FL 34950
                         renee_sihvola@fd.org


REPORTED BY:             JILL M. WELLS, RMR, CRR, CSR
                         Federal Official Court Reporter
                         701 Clematis Street
                         West Palm Beach, FL 33401
                         jill_wells@flsd.uscourts.gov
```

1                           I N D E X

2    DESCRIPTION                                        PAGE

3    Examination of:

4    CHRISTIAN HULL

5    Government Proffer        by Mr. Dispoto              4

6    Cross                     by Ms. Sihvola            20

7    Redirect                  by Mr. Dispoto            96

8

9                          E X H I B I T S

10

11   Government Exhibits 1 through 7                    111

12   Defense Exhibit 1                                  113

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (Case called to order of the court at 11:02 a.m.)

2          THE COURT:  Before we begin, I have some preliminary

3  announcements.  The first is that once this hearing has begun,

4  no one will be allowed to leave the room until we are done

5  except for an emergency, medical reason.

6          Next, our local rules prohibit all forms of

7  photography, as well as audio recording, as well as

8  broadcasting.  That includes contemporaneous tweeting or

9  texting.

10          In an abundance of caution, we are going to prohibit

11  all note taking other than with paper.

12          So let's have appearances, please.  I am calling the

13  case of United States of America v. Routh, 24-MJ-8441.

14          MR. DISPOTO:  Your Honor, good morning.

15          Mark Dispoto, appearing on behalf of the

16  United States.  Present with me at counsel table is Assistant

17  United States Attorney Adam McMichael, and off to the far

18  right, Special Agent Christian Hull, from the FBI.

19          THE COURT:  All right.  Good morning.

20          Defense.

21          MS. MILITELLO:  Good morning.

22          Kristy Militello and Renee Sihvola on behalf of Ryan

23  Rough.

24          Your Honor did pronounce his name correctly.  It is

25  Routh.

```
 1              THE COURT:  We are here for a pretrial detention
 2   hearing.
 3              Are we ready to proceed?
 4              MR. DISPOTO:  We are, your Honor.
 5              MS. MILITELLO:  Yes, your Honor.
 6              THE COURT:  Okay.  At this time, then, I am going to
 7   take judicial notice of the Pretrial Services report, as well
 8   as the criminal complaint, as well as the affidavit attached to
 9   the criminal complaint.
10              Government, how would you like to proceed?
11              MR. DISPOTO:  Your Honor, we would like to proceed by
12   proffer.  We have a witness available for cross-examination, if
13   necessary.
14              THE COURT:  Go ahead.
15              MR. DISPOTO:  Thank you, Judge.  Good morning again,
16   your Honor.
17              As the court is aware, the defendant in this case has
18   been charged by a criminal complaint with the unlawful
19   possession of a firearm by a convicted felon and possession of
20   a firearm with an obliterated serial number, all under Title
21   18, United States Code, Section 922.
22              The penalties for the offense charged in the criminal
23   complaint total a maximum of 20 years' imprisonment.  The
24   anticipated guideline range, without reference to any
25   applicable cross-references for the charged offense, is 70 to
```

1    87 months.

2         We have moved for pretrial detention based on risk of

3    flight and danger to the community, all under Title 18, United

4    States Code, Section 3142(f)(1)(E), because the charged offense

5    involves a firearm, and 3142(f)(2)(A), serious risk of flight,

6    and 3142(f)(2)(B), serious risk that the defendant will

7    threaten, injure, or intimidate, or attempt to threaten,

8    injure, or intimidate a prospective witness.

9         The government has filed a written factual proffer in

10   support of the detention at Docket Entry 14 both based on risk

11   of flight and danger to the community.

12        The United States submits that the factual proffer,

13   which we are prepared to provide orally here today, will

14   provide the court with probable cause to support additional

15   charges that can and should be considered by the court.

16        The court has the ability to receive and consider

17   additional facts and defenses beyond those which are contained

18   in the criminal complaint under Section 3142(f)(1).

19        The government will demonstrate, through its written

20   and oral factual proffer, that there is probable cause to

21   believe that the defendant attempted to assassinate a major

22   political candidate, specifically, former President of the

23   United States Donald J. Trump, in violation of Title 18, United

24   States Code, Section 351, a felony with a maximum sentence

25   punishable by life imprisonment.

1          Your Honor, I want to be clear, the United States

2    intends to present evidence of this case to a grand jury, and

3    among the charges that we will ask the grand jury to consider

4    includes a charge that the defendant attempted to assassinate

5    former President Trump, in violation of Title 18, United States

6    Code, Section 351.

7          With both the charged offenses and probable cause to

8    support the additional uncharged offense, the United States'

9    motion is based now upon the following sections under Title 18,

10   United States Code, 3142(f)(1)(A), an offense that involved a

11   crime of violence; 3142(f)(1)(B), an offense for which the

12   maximum sentence is life imprisonment; and 3142(f)(2)(E), any

13   felony that involves a firearm.

14         THE COURT:  Let me stop you.

15         Does the statute allow me to consider those things

16   even if they are not charged at the present time?

17         MR. DISPOTO:  Yes, Judge.  If you look at the Bail

18   Reform Act, specifically at 3142(f), it talks about the bases

19   for detention, and, specifically, the language in the statute

20   is a case that involves a crime of violence, offense for which

21   the maximum sentence is life imprisonment, and so forth.

22         It does not --

23         THE COURT:  So your view is that I can find that it's

24   a case that involves even though it's currently not charged?

25         MR. DISPOTO:  That is correct, your Honor.

```
 1            THE COURT:  All right.  Thank you.

 2            MR. DISPOTO:  Lastly, Judge, as to the law.

 3            The United States acknowledges its burden today.  The

 4    government must show by a preponderance of the evidence that

 5    the defendant is a risk of flight and by clear and convincing

 6    evidence that the defendant poses a danger to the community.

 7            For housekeeping, the United States has prepared

 8    several exhibits in support of its motion today, which we filed

 9    with the court.  We have provided copies to defense counsel.

10            We would move those exhibits into evidence solely for

11    the purpose of this hearing, and that would be Exhibits 1

12    through 7.

13            THE COURT:  All right.  Can I have a copy of those,

14    please?

15            Defense, do you have any objection to those exhibits?

16            MS. SIHVOLA:  Your Honor, at this time, assuming that

17    the witness that they have brought into court today can testify

18    to these exhibits in terms of authenticity or his knowledge, or

19    her knowledge, of them and their relevance, then we would not

20    have any objection to them.

21            THE COURT:  Do you plan to question the witness about

22    that when you get the chance?

23            MS. SIHVOLA:  Yes, your Honor, I would.  And if, for

24    some reason, upon the questioning that the witness does not see

25    their relevance and/or has no knowledge of them whatsoever,
```

```
 1   then we would have an objection.

 2              THE COURT:  I am going to admit them on a preliminary

 3   basis subject to the witness testifying following the proffer.

 4              You can proceed.

 5              MR. DISPOTO:  Thank you, Judge.

 6              Your Honor, by way of background, the Trump

 7   International Golf Club is located here in West Palm Beach,

 8   within Palm Beach County, in the Southern District of Florida.

 9   The golf course is boarded on the south by Summit Boulevard and

10   on the east by Congress Avenue.  The relevant events that gave

11   rise to the defendant's arrest took place on the southeast

12   corner of the property.

13              Could we show Exhibit 1, please.

14              The perimeter of Trump International, including the

15   area along Summit Boulevard, is surrounded by an unsecured wire

16   chain link fence less than 6 feet high.

17              And, your Honor, as you are looking at

18   Government Exhibit 1, the roadway that runs along the bottom of

19   Government Exhibit 1 is Summit Boulevard, and the roadway to

20   the right of the photo that runs vertical is Congress Avenue.

21              On the south side of the golf course, along Summit

22   Boulevard, tall trees and thick vegetation run along the street

23   side of the fence.  On the golf course side of the fence a dirt

24   path aligned with leaves and light vegetation runs along the

25   fence.  A small row of bushes and other light vegetation runs
```

approximately 15 to 20 feet from the fence, followed by the

golf course itself.

On September 15 of 2024, former President Donald J.

Trump was golfing at Trump International.  As the former

President advanced the course, a Secret Service agent, who was

part of the overall protective detail, moved along -- I'm

sorry, moved ahead of him in a golf cart and conducted a

security sweep to identify any potential threats and to ensure

the safety and security of the former President along the

route.

While the former President was on the fifth hole --

and I would direct the court's attention to the top of

Government Exhibit 1 that shows the fifth hole.  The tee box to

the putting green runs horizontal in an easterly direction

towards Congress Avenue.

While the former --

THE COURT:  On the exhibit, the number 5 is where the

tee box is?

MR. DISPOTO:  Correct.

THE COURT:  Got it.

MR. DISPOTO:  And the sixth tee box, as you can see,

is also so designated next to -- on the northeast corner of the

course.

While the former President was on the fifth hole, the

agent cleared the area along the sixth hole, which ran south,

1  along Congress Avenue, and then west, along Summit Boulevard,

2  at the bottom of the screen.

3          Specifically, the agent rode in a golf cart along the

4  chain link fence that separated the sixth hole from Congress

5  Avenue and Summit Boulevard.

6          Can we zoom in a little bit on the putting green on

7  the sixth hole, please.

8          As the agent traveled south along the fence that

9  borders Congress Avenue, he turned right and traveled along the

10  dirt path next to the fence that borders Summit Boulevard.

11          As he proceeded west along the fence, at approximately

12  1:30 p.m., the agent observed the defendant located behind the

13  fence in a position that provided a clear line of fire to the

14  sixth hole putting green.

15          The agent then observed a long black object protruding

16  through the fence and realized that the object was the barrel

17  of a rifle aimed directly at him.  The agent jumped out of the

18  golf cart, drew his weapon, and began backing away.  The agent

19  saw the rifle barrel move, and the agent fired at the

20  defendant.

21          The agent only took the necessary shots needed to

22  neutralize the threat while also being cognizant of his public

23  surroundings.  The agent then reached a nearby tree for cover,

24  conducted a tactical reload of his weapon, and looked up but

25  saw that the defendant had disappeared.

```
 1              The agent then radioed in what had transpired before

 2    clearing the tree line with another United States Secret

 3    Service special agent.

 4              Former President Trump, who at this point was on the

 5    putting green on the fifth hole, was immediately removed from

 6    the area by the Secret Service agents upon hearing the shots

 7    that were fired at the sixth hole.

 8              Law enforcement searched the area where the defendant

 9    was located.  What they found, your Honor, was nothing short of

10    a sniper position, something you might see in the movies or,

11    frankly, a war zone.

12              Can we pull up Exhibit 2, please.

13              As you can see from the photo, law enforcement located

14    a loaded rifle leaning up against the fence.  And, your Honor,

15    I will also point out, for the court's reference, you can see

16    in this photo, for lack of better descriptions, a dirt path

17    towards the top of the photo on the golf course side of the

18    fence.  That is the dirt path that the Secret Service agent

19    rode down when he ultimately saw the defendant on the other

20    side of the fence.  And as you can see, that is a very short

21    distance.

22              The rifle was equipped with a scope and a round in the

23    chamber, indicating that it could be fired with a single pull

24    of the trigger.  The rifle also had an extended magazine.  The

25    serial number on the rifle was obliterated and unreadable.
```

1          Can we pull up Government Exhibits 3 and 4.

2          Government Exhibit 3, your Honor, shows the rifle

3     recovered from the scene with the scope as well as the

4     magazine, and Government Exhibit 4 shows the obliterated serial

5     number.

6          The rifle was identified as an SKS semiautomatic that

7     fires 7.6 x 39 ammunition, the same type of round that is used

8     by militaries throughout the world.  The firearm contained a

9     total of 11 rounds.

10         Can we go back to Government Exhibit 2.

11         Located next to the firearm hanging on the fence was a

12    digital camera -- and you can see that, that small, little

13    device -- as well as two bags, including a backpack.

14         As your Honor can see, these bags were located low to

15    the ground and provided a narrow opening where the rifle, when

16    it was found by law enforcement, was leaning up against the

17    fence in that opening.

18         The bags, each contained a plate.  Those plates were

19    tested ballistically, and the test results indicated that both

20    of those plates were capable of stopping small arms fire.

21         Those plates also indicated, your Honor, and the

22    positioning of the bags in relation to the ground, clearly

23    demonstrates an attempt by the defendant to set up an area

24    where he could provide for himself maximum protection if in the

25    event the Secret Service returned fire.

1          THE COURT:  When you say "plates," by the way, do you

2     mean, like, kitchen plates, traditional ceramic plates?

3          MR. DISPOTO:  No.  So we are not sure if these plates

4     are made of metal or steel, which is why we just described them

5     as plates.  But like I indicated -- I guess I would analogize

6     it to a Kevlar plate, if the court is aware of what that is.

7          When they were tested, they basically proved to be

8     impenetrable, and they were specifically tested with rounds of

9     fire that the Secret Service uses in their weapons.

10          So for all intents and purposes, Judge, based on that

11     information, these were designed to protect Mr. Routh from

12     return fire.

13          Also located on the ground, and you can see in the

14     bottom left-hand corner of this photograph, was a black plastic

15     bag that contained food.  Those items there are mini sausage

16     snacks.

17          Since recovering the firearm, the FBI has conducted

18     forensic testing and processing.  The scope of the gun was

19     attached to the rifle in part by tape.  Upon that tape the FBI

20     recovered a latent fingerprint.  That print has been matched

21     preliminarily to the defendant, Mr. Routh.

22          Shortly after shots were fired, a civilian driving in

23     the area observed the defendant run across Summit Boulevard

24     towards a black Nissan Xterra, bearing a Florida license plate,

25     which was parked nearby.

1        Can we go back to Exhibit 1, please.

2        So, your Honor, if you look again at the bottom

3    right-hand portion of the screen, you will see Summit

4    Boulevard.  You will also see two entranceways that are

5    perpendicular to Summit Boulevard, both of which are west of

6    Congress Avenue.

7        That first roadway, the one to the right of the two,

8    is the roadway where Mr. Routh's Nissan Xterra was parked where

9    the witness saw him flee to.

10        The witness and the defendant made eye contact.  The

11    witness observed the defendant get into the Nissan Xterra and

12    flee at a high rate of speed.  The witness was able to get

13    close enough to the vehicle to take a picture of it.  He also

14    wrote down all but the last digit of the license plate.  The

15    witness immediately reported his observations to law

16    enforcement.

17        Officers from the Palm Beach County Sheriff's Office

18    and the Martin County Sheriff's Office located the Nissan

19    Xterra as it traveled northbound on I-95.

20        Could we pull up Exhibit 5, please.

21        Government Exhibit 5 shows the approximate distance

22    from where Mr. Routh was present at approximately 1:30 at the

23    fence next to Trump International Golf Club and the location

24    where he was arrested on I-95 approximately 45 minutes later.

25        At approximately 2:15 in the afternoon, the Martin

1    County Sheriff's Office initiated a motor vehicle stop on I-95.

2    The defendant was the driver and the sole occupant of the

3    vehicle.

4         During the stop law enforcement transported the

5    eyewitness to the scene, who positively identified the

6    defendant as the same individual who had previously been seen

7    entering the Nissan Xterra after fleeing from the forested area

8    next to Trump International.

9         Now, your Honor, I'd like to pause for a moment and

10   point out that the license plate that was attached to the

11   defendant's vehicle did not belong to the Nissan Xterra.   In

12   fact, it was registered to a totally different vehicle on the

13   west coast of Florida.

14        Agents learned from searching the vehicle, pursuant to

15   a federal search warrant, that at least two other license

16   plates were also located inside the car.   They also learned

17   that several additional items of interest, including six cell

18   phones, were found in the vehicle.   One of those phones

19   contained a Google search of how to travel from Palm Beach

20   County to Mexico.

21        Agents also located inside the vehicle 12 pairs of

22   gloves, a Hawaii driver's license in the defendant's name, and

23   a passport in the defendant's name.   They also located several

24   documents, including a handwritten list of dates in August,

25   September, and October and venues where former President Trump

had appeared or was expected to appear, and a notebook
containing dozens of pages filled with names and phone numbers
pertaining to Ukraine, discussions about how to join combat on
behalf of Ukraine, and notes criticizing the governments of
China and Russia.

　　　　The FBI has also obtained historical cell site records
for two of the phones found in the Nissan Xterra.  The phones
are serviced by different phone carriers that utilize different
cell towers.

　　　　Preliminary analysis of the records indicate that the
defendant's cell phone traveled from Greensboro, North
Carolina, to West Palm Beach, Florida, on August 14, 2024.

　　　　The records also show preliminarily that from
August 18, 2024 to September 15, 2024, the defendant's cell
phone accessed cell towers near Trump International and the
former President's residence at Mar-a-Lago.

　　　　As part of this investigation, FBI agents recently
reviewed a book, apparently authored by Mr. Routh in February
of 2023, entitled "*Ukraine's Unwinnable War: The Fatal Flaw of
Democracy, World Abandonment, and The Global Citizen-Taiwan,
Afghanistan, North Korea, and the End of Humanity.*"

　　　　In the book, the defendant stated that he "must take
part of the blame for the person that we elected for our next
president that ended up being brainless, but I am man enough to
say that I misjudged and made a terrible mistake, and Iran, I

1   apologize.  You are free to assassinate Trump, as well as me,

2   for that error in judgment and dismantling of the deal.  No one

3   here in the United States seems to have the balls to put

4   natural selection to work or even unnatural selection."

5           On September 18th of 2024, law enforcement contacted a

6   civilian witness who stated that the defendant had dropped off

7   a box at his residence several months ago.

8           After learning of the incident that occurred at Trump

9   International on the 15th, the witness opened the box.  The

10   witness stated that the box contained several items, including

11   a box of ammunition, a metal pipe, miscellaneous building

12   materials, tools, four phones, and various letters, including

13   the letter depicted in Government Exhibit 6.

14           Your Honor, I will read the first two sentences of

15   Government Exhibit 6.  The letter is addressed:

16           "Dear world:  This was an assassination attempt on

17   Donald Trump, but I am so sorry I failed you.  I tried my best

18   and gave it all the gumption I could muster.  It is up to you

19   now to finish the job, and I will offer $150,000 to whomever

20   can complete the job.  Everyone across the globe, from the

21   youngest to the oldest, know that Trump is unfit to be

22   anything, much less a United States president.  United States

23   presidents must, at bare minimum, embody the moral fabric that

24   is America and be kind, caring, and selfless, and always stand

25   for humanity."

1        The letter went on to say further that, "He" -- the

2   former President of the United States -- "ended relations with

3   Iran like a child and now the Middle East has unraveled."

4        The FBI and other law enforcement agencies have

5   interviewed numerous people throughout the country, including

6   Hawaii and North Carolina.  Based on those interviews, the

7   government has learned that the defendant does not have any

8   established ties or connection to the Southern District of

9   Florida.  He does not reside here, have family here, vacation

10  here, or have any legitimate employment purpose for being here.

11       Based on this information, the defendant appears to

12  have been located in West Palm Beach area on September 15th of

13  2024 and for the preceding one month prior to his arrest on

14  that day for one reason and one reason only, and that was to

15  kill the former President of the United States.  And if it

16  wasn't for the quick response of the United States' Secret

17  Service, a very brave American citizen, and overwhelming

18  response from law enforcement, former President -- I'm sorry,

19  the defendant may very well have succeeded.

20       After his arrest, the defendant spoke on a recorded

21  jail line with a female acquaintance.  During the call, the

22  defendant informed her that the call was being recorded.

23  Towards the end of the call, the defendant told the female that

24  he was sorry.  The female responded, "I am processing the most

25  horrible thing that you could have done."  The defendant

```
 1    responded by apologizing again.

 2              Your Honor, that concludes the factual proffer, and I

 3    would reserve the right to make argument regarding detention.

 4              THE COURT:  Thank you.

 5              Defense, would you like to cross-examine the agent?

 6              MS. SIHVOLA:  Yes, your Honor.

 7              THE COURT:  All right.  Can the agent come forward,

 8    please.

 9                           CHRISTIAN HULL,

10    having been first duly sworn on oath, was examined and

11    testified as follows:

12              THE DEPUTY CLERK:  Please state your name for the

13    record.

14              THE WITNESS:  Special Agent Christian Hull.

15              THE COURT:  You can proceed defense.

16              MS. SIHVOLA:  As a preliminary matter, if I might put

17    something on the record.

18              Before this hearing began we had requested the

19    government to provide Jencks material, and they have done so.

20              THE COURT:  All right.  Thank you very much.

21              MS. SIHVOLA:  Thank you.

22              THE COURT:  Is it Hull or Hall?

23              THE WITNESS:  H-U-L-L.

24              THE COURT:  Thank you.

25              Go ahead.
```

```
 1   CROSS-EXAMINATION

 2   BY MS. SIHVOLA:

 3   Q.  Agent Hull, did you review certain evidence and material

 4   before your testimony today?

 5   A.  Yes, I did.

 6   Q.  Did you review the government's proffer that they had filed

 7   this morning?

 8   A.  Yes, I did.

 9   Q.  Did you review surveillance video?

10   A.  I have reviewed some video, yes.

11   Q.  So let's talk about the video that you reviewed.

12        Did you review the video from the Trump International

13   golf course?

14   A.  No, I have not.

15   Q.  But there is -- have you reviewed reports detailing that

16   footage?

17   A.  I have not.

18        Of the actual golf course itself?

19   Q.  Yes.

20   A.  I have not.

21   Q.  Or cameras surrounding the golf course?

22   A.  I am aware that there was camera footage pulled in and

23   around the golf course, or I guess around the golf course is a

24   better way to put it, in the area.

25   Q.  From various businesses?
```

1   A.  There was a canvas for business footage.

2   Q.  And was some recovered?

3   A.  I do know we pulled down some video from businesses or

4   spots in the area, but I have not reviewed those.

5   Q.  Okay.  Did you review the reports that detail what's in

6   those videos?

7   A.  I have not reviewed all of the reports, no.

8   Q.  What about reports about the West Palm Beach city camera

9   footage?

10   A.  Are you referring to the one that was like -- I think I

11   know which one you are talking about.  I am aware that we

12   pulled footage that was from, I believe, the School Board that

13   was in the area, but I did not review that footage.  I am aware

14   we have some, though.

15   Q.  Did you review the report that details the School Board

16   footage?

17   A.  No, I did not review a final report of that.

18   Q.  Let me ask you this.  Are you aware of any type of

19   surveillance video that captures the individual with the

20   firearm?

21   A.  Could you be more specific?  Like the individual holding

22   the firearm?  Is that what you are referring to?

23   Q.  Yes.

24   A.  We do not have any video of the individual holding the

25   firearm that I am aware of right now.

1  Q.  What about the individual while the person is on or right

2  next to the fence line area?

3  A.  Surveillance footage?

4  Q.  Yes.

5  A.  No, I am not aware of that.

6  Q.  What about video of the crossing of the street?

7        MS. SIHVOLA:  Could we pull up Government Exhibit

8  Number 1, please.

9  BY MS. SIHVOLA:

10 Q.  The footage on the southeast corner crossing from the

11 grassy area across the street to where the vehicle was parked.

12 A.  I am not aware of any video that captures the subject

13 running across the street.

14 Q.  Okay.  Are you aware of any video from this scene capturing

15 the suspect?

16 A.  No, I am not.

17 Q.  You did review the Martin County stop with their body

18 camera footage.

19 A.  I have reviewed portions of it, yes.  We are still getting

20 footage in.

21 Q.  Okay.  What about the footage on the GoPro camera that was

22 on the fence?

23 A.  That footage was reviewed not by myself.

24 Q.  Did you review reports of that footage?

25 A.  I took verbally that there was a handful of videos.  I am

```
 1   not sure of the exact amount that were on the camera.
 2   Q.  And did you review the license plate, the LPR captures of
 3   the vehicle in question?
 4   A.  I have seen LPR data.
 5   Q.  Have you -- do you have those records?
 6   A.  We do have them.  I do not have them with me here today.
 7   Q.  Did you review reports about those records?
 8   A.  I have taken a lot of verbal statements about the LPRs, but
 9   I have not reviewed finalized reports with detail on that
10   exactly.  I can't remember any of that.
11   Q.  The government in their proffer spoke about ballistics
12   testing.
13          Did you review those reports?
14   A.  At this time, that's a preliminary result.  We do not have
15   an official report, that I am aware of.
16   Q.  Okay.  So there is no official report on the testings of
17   the tiles?
18   A.  By the time I am sitting here today, it's possible it's in
19   there.  I am just not aware that we have the official report
20   yet.
21   Q.  Have you spoken to the individual who did the testing of
22   those tiles?
23   A.  No.
24   Q.  So a different individual contacted you about that
25   ballistics testing?
```

1    A.  We received word about the ballistics testing, yes.

2    Q.  You also received word about fingerprint and DNA testing?

3    A.  That's correct.

4    Q.  And both were done in this case?

5    A.  Fingerprints and DNA have been analyzed in this case.

6    Q.  Okay.  And of all of the fingerprint latent prints that

7    were lifted, only one ended up being identified to a person?

8    A.  Out of all of the stuff that was analyzed, you are asking?

9    Q.  Of all of the latent lifts that were lifted, only one came

10   back as, we'll just say for lack of a better word, a match to a

11   person; is that correct?

12   A.  Are you asking about the firearm specifically or all

13   evidence?

14   Q.  All of the evidence.

15   A.  No.  We have had multiple fingerprint matches.

16   Q.  Okay.  Any other matches to Mr. Routh?

17   A.  Yes.

18   Q.  Okay.  And what items were those?

19   A.  I can't give you a specific right now.  I just know several

20   different items had -- I know it came from handwritten notes.

21   Q.  Okay.

22   A.  But I have not seen --

23          THE COURT:  Do you know, agent, were any of the

24   fingerprints matched to Mr. Routh from the materials that were

25   found there near the rifle?  The plates, for instance, or

1   anything like that?

2          THE WITNESS:  I am aware that there was a fingerprint

3   on the rifle and that there was a plastic bag.  I am not sure

4   where it was located, if it was inside of one of the bags

5   hanging on the fence or if it was next to it.  I know it was in

6   that region of the exhibit.

7          MS. SIHVOLA:  Could we pull up Exhibit Number 2.

8   BY MS. SIHVOLA:

9   Q.  So are you talking about this plastic bag that's visible in

10  this photograph?

11  A.  I was told that there is a fingerprint hit to the subject

12  off of a plastic bag.  I am not able to tell you if it is that

13  plastic bag that you are speaking of right here, but it was

14  somewhere in this region.  That's what I was aware of, or it

15  was explained to me.

16  Q.  Okay.  So is there a bag in the lower left-hand corner with

17  the sausages?

18  A.  From looking at this photo, it does look like there is a

19  plastic bag there.

20  Q.  So you are not sure if it could have been from there or

21  another plastic bag in the area?

22  A.  Correct.  It could have been potentially a plastic bag

23  within these bags that are hanging on the fence.  I am not

24  quite sure.

25  Q.  And for the DNA analysis, was there anyone's DNA on any of

1    these items found at the scene?

2    A.  We had a preliminary DNA match to the subject off of one of

3    these two bags that are hanging on the fence.

4    Q.  One of the bags that are connected to the fence line area?

5    A.  Yes.

6    Q.  Where was that DNA collected from?

7    A.  I am not sure of specifics there.  These are all

8    preliminary reports, and we are still waiting for the official

9    report to come down and a one-to-one comparison on the DNA and

10    fingerprints.

11    Q.  Okay.  But in terms of the GoPro and the firearm, you did

12    not -- there was no DNA that had any preliminary match to

13    Mr. Routh?

14    A.  Not that I am aware of.  Just the fingerprint on the

15    firearm.

16    Q.  Okay.  And when you say it's on the firearm, are you

17    talking about on the electrical tape?

18    A.  It was explained to me that it was on the tape, but I can't

19    confirm for sure that that's where it was.  We are still

20    waiting on an official report.  But that's how it was

21    understood, the tape on the scope.

22    Q.  Okay.  And did you review -- you mentioned -- or in the

23    proffer it was mentioned there were six phones that were

24    collected from the vehicle and then four phones from this box.

25        Were you able to review the contents of those ten

 1   phones in total?

 2   A.   The six phones that are in the vehicle are being analyzed.

 3   I have not gotten the official report on all of those.  I have

 4   seen some data coming out of those phones.  But the four

 5   phones --

 6   Q.   In the box that was given to the civilian, according to the

 7   government's proffer.

 8   A.   Correct, yeah.  Those have not been uploaded.

 9   Q.   Meaning that they have been analyzed, but you are not aware

10   if --

11   A.   They have not been analyzed.

12   Q.   Okay.  The scene itself from where we see this, the rifle's

13   position, did you physically go to this scene and see these

14   items with your own eyes?

15   A.   I was at the scene, yes, and I did see that area.

16   Q.   When you were at the scene, is this how you saw the

17   position of this rifle?

18   A.   I did not see the rifle this way.  I knew it was back into

19   the tree line.  So to preserve the scene and not have other

20   people, as little of people walking in and out of that region,

21   I did not walk up there.

22        At some point it was supposed -- it was going to rain.

23   So the firearm was moved at a certain point.  So I never -- by

24   the time that happened, I never got back to see it in this

25   exact way.

1    Q.  Was the firearm moved before or after this picture was

2    taken?

3    A.  Yeah, I believe that this photo was taken before anything

4    was moved at all.

5    Q.  Okay.  So how close did you physically come to this area,

6    if you can estimate for distance, about your own observations?

7            MR. DISPOTO:  Your Honor, I am going to object based

8    on relevance.

9            THE COURT:  Defense.

10           MS. SIHVOLA:  It goes to his ability to testify to his

11   personal knowledge of what he actually saw and the accuracy of

12   the information that the government has proffered.

13           THE COURT:  I am going to sustain the objection.  You

14   of course have the right to inquire into the strength of the

15   evidence, but I think that goes a little bit far afield.  So I

16   am going to sustain it and ask you to move on.

17   BY MS. SIHVOLA:

18   Q.  So have you done any investigation into Mr. Routh?

19   A.  Yes, we have investigated Mr. Routh.

20   Q.  Okay.  And was there ever any prior federal surveillance of

21   him?

22           MR. DISPOTO:  Objection.  Relevance.

23           MS. SIHVOLA:  Your Honor, the government is going into

24   great detail in terms of Mr. Routh's background.  They

25   mentioned even during the written proffer, as well as in their

```
 1  exhibits --
 2            THE COURT:  That's fair.  Overruled.
 3            Go ahead.  You can answer.
 4  A.  Not that I am aware of.
 5  BY MS. SIHVOLA:
 6  Q.  Okay.  You are not aware of any prior federal investigation
 7  of him or any federal cases against him?
 8  A.  I know there was a potential complaint in the past, but I
 9  am not aware of the details as I sit here today.
10  Q.  When you say "complaint," do you mean somebody telling a
11  federal agent in 2019 that he had a firearm?
12  A.  Yes, that sounds right, that there was something of that
13  nature.  I am not aware of the details.
14  Q.  Okay.  Are you aware that information was passed on to
15  Honolulu, or if anything was done with that?
16            MR. DISPOTO:  Your Honor, I renew my objection for
17  relevance.
18            MS. SIHVOLA:  Same response, your Honor.  The
19  government is going into his background in terms of --
20            THE COURT:  Understood.
21            You can answer that question, but I am not going to
22  let it go too much further.
23            MS. SIHVOLA:  That's fine.
24  A.  I believe the Honolulu field office did have that
25  information.  I am not sure what was done of it.
```

1    BY MS. SIHVOLA:

2    Q.  Okay.  The government mentioned in its proffer that many

3    people across the country, in Hawaii and in North Carolina,

4    were contacted in terms of Mr. Routh's contacts in Florida and

5    his employment in Florida.

6            Did you do those contacts?

7    A.  I did not make any of those contacts.

8    Q.  Not a single one of them?

9    A.  No, I did not.

10   Q.  So you are relying on other officers' reports?

11   A.  Verbal statements and reports, yes.

12   Q.  Okay.  Based on the verbal statements and reports that came

13   to you, approximately how many people were contacted about

14   Mr. Routh in terms of his history to Florida and his

15   employment?

16   A.  Can you give me the last part of that question again?

17   Q.  Yes.

18           How many people were contacted?  When the government

19   is making a proffer that he had no ties to Florida,

20   approximately how many people did they speak to?

21   A.  I could tell you we have spoken to a lot of individuals.  I

22   am not sure what the number is at this point, and that number

23   does change by the day.  It's an ongoing investigation and

24   there is a lot of leads coming in.  So I do not have a number

25   for that.

```
 1    Q.  Is it more than two people?

 2    A.  We have spoken to more than two people about, yes, Routh's

 3    background.

 4    Q.  Do you have any range for his Honor in terms of the number

 5    of people giving you this information, any estimate, a range of

 6    people?

 7    A.  Are you talking -- as far as people that we have

 8    interviewed?

 9    Q.  People that you interviewed regarding Mr. Routh's contacts

10    or noncontacts to Florida.

11    A.  I do not have a number for that.  It is multiple, though.

12    Q.  Okay.  You also reviewed his social media.  Is that fair to

13    say?

14    A.  To an extent.  I am sure that database checks were done on

15    social media type things, or people tried to review social

16    media, yes.

17    Q.  Okay.  And you are aware that he had made posts about all

18    of the fight that he has been doing for Ukraine, fighting for

19    families and democracy?

20    A.  I am not sure if that came from his social media.  I am

21    aware that he did have some Ukraine ties there with that.

22    Q.  Did you review the number of interviews that he gave in

23    2022 when he was in Ukraine to various news sources?

24    A.  I personally have not reviewed those.

25    Q.  Okay.  Are you aware of them?
```

```
1    A.  I am aware that Mr. Routh has spoken to reporters in the
2    past.  I don't know to the extent of what those interviews
3    were.
4    Q.  Okay.  But you can generally say that he showed his support
5    for Ukraine and Taiwan and fighting for democracy?
6    A.  I guess that would be a fair statement.  I am not really
7    sure of the depth of the -- I don't have a whole lot of depth
8    on that topic for review.
9    Q.  Okay.  So you personally have not done any review yourself?
10   A.  That's not true.
11            Are you talking about for this topic?
12   Q.  For the social media -- in terms of Mr. Routh's social
13   media in the past few years.
14   A.  I have not done those checks, no.
15   Q.  Okay.  And you haven't reviewed any of your fellow agents'
16   review of his social media?
17   A.  I have not seen any final reports on his social media
18   posts, no.
19   Q.  Okay.  And so no one that you know about, him meeting
20   representatives in D.C. last year, or attempting to --
21            MR. DISPOTO:  Objection, your Honor.  Relevance.
22            MS. SIHVOLA:  Your Honor, it goes to his background.
23   The government is attempting to represent significant details
24   in terms of Mr. Routh's history.
25            This is one of my final questions in this field.
```

1          THE COURT:  I will let this one go, but that's because

2     the government proffered evidence regarding the book he had

3     supposedly written dealing with Ukraine.

4          I am going to let this go a little bit, but I am not

5     going to let it go too far.

6          MS. SIHVOLA:  Correct.  I don't have much more, your

7     Honor.

8          THE COURT:  Go ahead.

9     BY MS. SIHVOLA:

10    Q.  Are you aware of his attempts, even in Washington, D.C., to

11    meet with representatives regarding Ukraine and Taiwan?

12    A.  I am not aware of any specifics on that.

13    Q.  Okay.  Are you aware of any of his background history in

14    terms of where he grew up or that he is an Eagle Scout,

15    anything like that?

16    A.  I am not, no.

17    Q.  Okay.  You reviewed at least his criminal history?

18    A.  I did see his criminal history.

19    Q.  Okay.  And in his criminal history, you would agree with me

20    that there's no physical acts of violence?  He has no history

21    of being violent of any nature?

22         MR. DISPOTO:  Your Honor, I am going to object.  The

23    question calls for the witness to give legal conclusions.

24         THE COURT:  I am going to sustain that because I think

25    his criminal history is part of the Pretrial Services report

```
 1    and we can all draw our own conclusions about what it means.

 2             You are free to make that argument when we get to that

 3    stage.

 4             MS. SIHVOLA:  All right.

 5    BY MS. SIHVOLA:

 6    Q.  So let's talk about the scene itself at the Donald J. Trump

 7    golf course.

 8             We see a fence in Exhibit Number 2.  Is there any

 9    evidence from the federal government that the person who was

10    seated or at this position ever crossed the fence?

11             And when I say "crossed the fence," onto the golf

12    course.

13    A.  Are you talking about ever or just during this incident?

14    Q.  During this incident.

15    A.  I am not aware of any statements that say that he -- the

16    individual entered the golf course grounds.

17    Q.  Okay.  What about ever?

18    A.  I am not sure.  I know there is a lot of cell phone digital

19    evidence that we have, and that would have to be reviewed in

20    full.

21    Q.  So as we sit here today, you are not aware of any evidence,

22    whether it's statements or physical evidence or digital

23    analysis, that the person ever crossed this fence line?

24    A.  Correct.  I would have to wait for a full analysis before I

25    could -- we could make that statement.
```

1    Q.  And is it fair to say that you looked at a map of the golf

2    course?

3    A.  Yes, I have seen a map of the golf course.

4    Q.  And you also walked the golf course yourself?

5    A.  I have been on the golf course, a portion of it, yes.

6    Q.  And you would agree with me that the portion where the

7    majority of the firearm is sitting is not on the golf course

8    itself; is that correct?

9    A.  Are you asking from this photo?

10   Q.  No.  I am saying that where the rifle -- we will just say

11   the sausages, okay?

12        Where the sausages are in the photograph, that is not

13   part of the standard golf course; is that correct?

14   A.  Are you talking about the -- everything on the -- closer to

15   the camera, you say that's not the golf course ground.  Is that

16   your question?

17   Q.  That's what I am asking.

18   A.  To my understanding, that is correct.

19   Q.  Okay.  The degree that the firearm was sitting, are you

20   aware of this angle, like how high from the ground it was?

21   A.  I mean, I can't say that from looking at this photo, where

22   it was at.

23   Q.  Okay.  Are you aware from reports or other individuals,

24   crime scene analysts who took observations of the scene, how

25   physically high it was above the ground, this rifle?

1          MR. DISPOTO:  Your Honor, I am going to object to the

2    form of the question.  The photograph speaks for itself.

3          THE COURT:  Sustained.  Sustained.

4          Well, go ahead.  What's your response?

5          MS. SIHVOLA:  Your Honor, if I may.

6          The government was representing that this is

7    essentially a sniper position and a war zone.  I believe if

8    there is information in terms of exactly how high it was off

9    the ground, that would be relevant to combat the government's

10   proffer.  As they are proffering these bold statements of the

11   positioning of the firearm, I think that we have a right to ask

12   for details of it.

13         THE COURT:  I am going to sustain the objection

14   because I think we can draw our own conclusions from the photo

15   itself.

16   BY MS. SIHVOLA:

17   Q.  How much of the rifle was protruding through the fence?

18         MR. DISPOTO:  I am going to object to the form of the

19   question as to the time frame.  Is she talking about at the

20   moment this was taken or when the Secret Service agent saw it?

21   I think we need more clarity as to when she is talking about.

22         THE COURT:  Can you narrow the question?

23         MS. SIHVOLA:  I can, your Honor.

24   BY MS. SIHVOLA:

25   Q.  When the rifle was found and photographed in this position,

1   approximately how much of the rifle is sticking through the

2   fence?

3           MR. DISPOTO:  Same objection, your Honor.  The

4   photograph speaks for itself.  This witness' estimation as to

5   how far it's peeking through the fence is not relevant.

6           MS. SIHVOLA:  Your Honor, this is an individual --

7           THE COURT:  Let me stop you.

8           Agent, based upon a comparison of the two photos of

9   the entire rifle in this photo itself, do you have an estimate

10  of how many inches the barrel of the rifle was sticking through

11  the fence in this photo?

12          THE WITNESS:  Your Honor, I can guess, but my guess is

13  going to be just like anybody else looking at this photo.

14          THE COURT:  What's your guess?

15          THE WITNESS:  Do you want me to go ahead?

16          THE COURT:  Sure.

17          THE WITNESS:  I would say 3 inches it appears from

18  this photo that we are looking at here.

19          THE COURT:  All right.

20          You can keep going.

21  BY MS. SIHVOLA:

22  Q.  Did you ever speak with a single crime scene analyst who

23  documented their observations of these items or review any of

24  their reports?

25  A.  I did speak to some of the folks that were on scene that

1   processed this scene, yes.

2   Q.  But you never reviewed the reports?

3   A.  I haven't reviewed their final report, no.

4   Q.  Okay.  Upon speaking with them, did they indicate how much

5   of the firearm was sticking through the fence?

6   A.  No, they did not.

7   Q.  Okay.  And did they indicate anything about the position of

8   the rifle at all to you, or did you ask?

9   A.  Are you talking about from this photo here?  I mean --

10  Q.  Correct.  Because you are saying that this is the rifle as

11  it is stationary when crime scene photographed it; is that

12  correct?

13  A.  Correct.

14  Q.  Okay.  So I am asking about the crime scene observations of

15  when they looked at this rifle in this position.

16        Did they communicate those to you?

17  A.  Most of the individuals that came on scene, came on scene

18  after this firearm had to be moved due to weather and

19  preservation of evidence.

20        So the photo that we have here is the original

21  position, as far as I am aware, and I have not spoken to

22  anybody who made any additional comments to me about any of the

23  questions that you are asking in relation to the positioning of

24  this firearm.

25  Q.  Okay.

1    A.  We just have that photo.

2    Q.  Were any shell casings found on the scene?

3    A.  Are you talking about spent shell casings?

4    Q.  Correct.

5    A.  We did recover a spent shell casing, I believe, yes.

6    Q.  Where was that recovered from?

7    A.  I would have to review the report to see the exact location

8    of that, and you would have to speak to the investigators that

9    processed the scene to get that firsthand account.

10   Q.  Was it a shell casing from the Secret Service individual or

11   from a different firearm?

12   A.  From my understanding verbally was that it would have been

13   from the Secret Service agent is the shell casing that we would

14   have recovered.

15   Q.  But only one?

16   A.  No.  It was several.  But I do not have the exact number

17   sitting here today.

18   Q.  Okay.  Would the shell casings have been visible in this

19   photograph?

20   A.  I am not sure where they were recovered from.

21   Q.  Okay.  Any projectiles recovered?

22   A.  I believe so, but I would have to refer to a report for an

23   official on that.

24   Q.  Okay.  Do you know how close the projectiles were recovered

25   from?

```
 1   A.  I do not know exactly where they were located.

 2   Q.  Or amount?

 3   A.  I can't sit here today and give you a firm answer.

 4   Q.  Okay.  There was no indication that Mr. Routh or his

 5   vehicle was ever struck with any projectile?

 6   A.  Mr. Routh, to my knowledge, had no injuries.  And we

 7   processed the vehicle, and it has not been relayed to me that

 8   any rounds had struck the vehicle, to my knowledge.

 9   Q.  Okay.  What about any damage to civilian property?

10           MR. DISPOTO:  Objection.  Relevance.

11           THE COURT:  Sustained.

12   BY MS. SIHVOLA:

13   Q.  The government mentioned that there were plates found in

14   these bags that were hanging; is that correct?

15   A.  That is correct.

16   Q.  How many plates were in these bags?

17   A.  To my understanding, we have recovered two plates, but I

18   have not seen the plates.

19   Q.  Were they one plate in each bag?

20   A.  That is my understanding.

21   Q.  What is the size of these plates?

22   A.  I do not have that.  We would have to wait for an official

23   report to come back.

24   Q.  Okay.  So when the government proffered that these plates

25   would have protected the person, you actually can't testify to
```

```
 1    that because you don't know how big they are?
 2              MR. DISPOTO:  Objection.  Calls for speculation.
 3              THE COURT:  Sustained.
 4    BY MS. SIHVOLA:
 5    Q.  Can you testify with any accuracy if these plates could
 6    have actually protected anyone?
 7              MR. DISPOTO:  Objection.  Calls for speculation.
 8              THE COURT:  Sustained.  He's already indicated he
 9    doesn't know what size the plates were.  We can draw our own
10    conclusions from that.
11    BY MS. SIHVOLA:
12    Q.  How thick were the plates?
13              MR. DISPOTO:  Objection.  Relevance.
14              MS. SIHVOLA:  Your Honor, it goes to the government's
15    proffer.
16              THE COURT:  You can answer that, if you know.
17    A.  Ma'am, I did not see these plates, so I do not know.  All I
18    know is that it was ballistically tested, and it held up to the
19    ballistic testing preliminarily.
20    BY MS. SIHVOLA:
21    Q.  Okay.  When you say "ballistic testing," somebody fired at
22    these plates in a laboratory setting?  Is that fair to say?
23    A.  My understanding is that they fired at it.  I don't know
24    what the setting was, but they did fire with a weapon and
25    ammunition that was similar to the Secret Service
```

```
 1    specifications on their firearms.

 2    Q.  What was the ammunition fired?

 3            MR. DISPOTO:  Objection.  Relevance.

 4            MS. SIHVOLA:  Your Honor, it goes to the government's

 5    proffer.

 6            THE COURT:  You can answer, if you know.

 7    A.  I do not know that answer.

 8    BY MS. SIHVOLA:

 9    Q.  Okay.  What was the firearm fired?

10    A.  It was -- to my understanding, it's the same specification

11    that the Secret Service agent had.  I do not know what it was

12    offhand.

13    Q.  Okay.  Was it a small firearm, like a handheld gun?

14    A.  It was a pistol, yes.

15    Q.  It wasn't a rifle?

16    A.  Correct.

17    Q.  Do you know if these plates would have stood up to a rifle?

18    A.  I do not.

19    Q.  Besides -- how many rounds were fired at these plates

20    during the ballistics testing?

21    A.  I believe five, but I would have to refer to the official

22    report to know that answer.

23    Q.  Okay.  So approximately five at each one or five total?

24    A.  Five total, but that's just my understanding.  Again, we

25    would have to get an official report for a firm answer on that.
```

1    Q.  And you don't know the distance in which they were fired?

2    A.  No.

3    Q.  You said -- besides the rifle, the plates, and these bags,

4    the GoPro, the sausages in this bag, is there any other object

5    found in this vicinity that was collected into evidence?

6    A.  There was a letter that was addressed to the *New York*

7    *Times*, I believe, that was found nearby.

8    Q.  When you say "nearby" -- if we can pull up Government

9    Exhibit Number 1 -- where do you mean "nearby"?  Was it closer

10   to the street or closer to the golf course?

11   A.  As explained to me verbally, it was approximately 15 feet

12   from the original photo that you have.  I do not know exactly

13   where.

14   Q.  Okay.  So you don't know if it was on, like, the sidewalk

15   or towards the bushes?

16   A.  I believe it was in the bushes somewhere.  Like I don't

17   know if it was to the east or to the west, but it was in that

18   vicinity, which was what your question was.

19   Q.  Okay.  This letter, was there any forensic testing done on

20   this in terms of fingerprint or DNA?

21   A.  There was.

22   Q.  And what did that come back as?

23   A.  I would have to get a full readout on that as well, but I

24   do know we did have a fingerprint comparison on that.

25   Q.  Okay.  Did that come back to anyone?

```
 1    A.  It did come back to a different individual.

 2    Q.  Who is?

 3           MR. DISPOTO:  Objection.  Relevance as to the

 4    identity.

 5           THE COURT:  It did not come back to Mr. Routh?  Is

 6    that what you are saying?

 7           THE WITNESS:  I would have to review to see if there

 8    was also a hit to Mr. Routh.  I am not sure on that one.

 9           THE COURT:  To the extent you have -- it came back to

10    another person, I am going to sustain the objection as to the

11    identity of that person.  All I am concerned about is whether

12    it came back to Mr. Routh or not.

13           You are telling me you can't answer that?

14           THE WITNESS:  I do not know as I sit here right now.

15    BY MS. SIHVOLA:

16    Q.  Without revealing the identity, can you tell us if that

17    person has any connections to Mr. Routh whatsoever?

18           MR. DISPOTO:  Objection.  Relevance.

19           MS. SIHVOLA:  Your Honor, it goes --

20           MR. DISPOTO:  I'm sorry.

21           MS. SIHVOLA:  It goes to physical evidence connected

22    to Mr. Routh, if there's any connection at all, whether it's

23    employment or family or anything of that nature.

24           THE COURT:  Go ahead, government.

25           MR. DISPOTO:  Your Honor, we haven't proffered
```

1    anything about this letter, and it's our burden of proof with

2    respect to these proceedings.  So this is some ancillary matter

3    that is not part of the government's proffer.

4           THE COURT:  I am sustaining the objection because I

5    think it's cumulative.  There's been enough evidence at the

6    scene connected to Mr. Routh.

7           But go ahead.

8           MS. SIHVOLA:  Your Honor, if I just might respond very

9    briefly.

10           This is evidence showing it's not Mr. Routh.  This

11    would actually be *Brady* material showing physical evidence

12    connecting someone else.

13           We don't have to ask evidence that only supports the

14    government's position.  We are allowed to ask for potential

15    exculpatory materials, and that's the brief question, only if

16    this person has any connection to Mr. Routh whatsoever.

17           THE COURT:  I am sustaining the objection.  Please

18    move on.

19    BY MS. SIHVOLA:

20    Q.  The contents of the letter, did they -- what did it say?

21    A.  I would have --

22           MR. DISPOTO:  Same objection, your Honor.

23           MS. SIHVOLA:  Your Honor, the government proffered a

24    letter, and I am simply trying to establish is there any

25    evidence that it's similar in nature or if it's completely

```
 1    different, showing a different individual.

 2              THE COURT:  Government.

 3              MR. DISPOTO:  We didn't proffer anything about this

 4    letter.  So this is not before the court.  It is an ancillary

 5    matter that's not relevant to these proceedings.

 6              THE COURT:  Understood.

 7              I am overruling the objection.  It was found near the

 8    scene.

 9              Go ahead.  What did the letter say?

10              THE WITNESS:  I would need to review the letter again

11    to be able to give you a description of the letter.

12    BY MS. SIHVOLA:

13    Q.  Was there any mention of former President Donald J. Trump

14    in the letter?

15    A.  I would have to review the letter.

16    Q.  So there was a letter found right near the scene, and you

17    have no idea what it says?

18    A.  I did review the letter.

19              We are eight days into this investigation.  We have

20    taken in a lot of information, and I would need to review the

21    letter again to see what it said.

22    Q.  Okay.  Mr. Routh is being accused of assassinating former

23    President Donald J. Trump.

24              Was there anything of any evidentiary nature in it, in

25    the contents of that letter?
```

```
 1   A.   I would have to review the letter again to be able to give

 2   you an answer to that question.

 3   Q.   Was there anything indicating someone else had written that

 4   letter?

 5           MR. DISPOTO:  Objection, your Honor.  The witness has

 6   already testified he would have to review the letter again to

 7   refresh his recollection as to its contents.

 8           THE COURT:  You can answer her more specific question.

 9           The objection is overruled.

10           Go ahead.  Go ahead and restate the question.

11   BY MS. SIHVOLA:

12   Q.   Was there any indication that anyone else had written that

13   letter?

14   A.   Are you asking me to speculate?

15           THE COURT:  No.  She is asking you, based upon

16   whatever recollection you have of the letter, was there any

17   indication that someone else wrote it?

18           THE WITNESS:  There is nothing that jumped out to me

19   that made it to where I felt like somebody else would have

20   wrote that letter.

21   BY MS. SIHVOLA:

22   Q.   Was there any handwriting analysis done for that letter on

23   scene versus the letter that the government chose to proffer

24   this morning?

25   A.   We have not done an official comparison.
```

1    Q.  Okay.  Was there anything buried at the scene that federal

2    agents dug up and collected into evidence?

3    A.  Our crime scene folks would have to answer that question.

4    Q.  You are not aware?

5    A.  No.

6    Q.  All right.  So if we can back up a little bit in this

7    photograph.

8            The government had proffered, in terms of line of

9    sight, where the rifle had posted -- if we could back up.

10           Zoom out.  If we could zoom out -- thank you so

11   much -- for Government Exhibit 1.

12           The government had proffered that the rifle was within

13   the line of sight of the sixth green; is that correct?

14   A.  That is correct.

15   Q.  But you would agree with me that there was no line of sight

16   between where the rifle was and where former President Donald

17   J. Trump was on the fifth course -- on the fifth hole of this

18   golf course?

19   A.  I am not sure on that one.  I would have to go back to the

20   scene and look to see if there is any line of sight onto the

21   fifth hole or to the fifth green.

22   Q.  Okay.  Are you aware of any representations by the head of

23   the Secret Service stating that there was no line of sight?

24   A.  Can you ask me that question again?

25   Q.  Are you aware of all of the press releases that have been

1  done, including the head of the Secret Service, stating that

2  there was no line of sight between where the person was and

3  where Donald J. Trump was?

4  A.  I am not aware of his statement, no.

5  Q.  So you are not aware that he had said the subject, who did

6  not have a line of sight to the former President, fled the

7  scene?

8           MR. DISPOTO:  Objection.  Asked and answered.

9           THE COURT:  Sustained.

10          Move on.

11  BY MS. SIHVOLA:

12  Q.  There is no indication that former President Donald J.

13  Trump or the individual in which he was golfing with, Steve

14  Witkoff, ever saw any firearm, correct?

15  A.  I mean, I don't believe that -- I don't have any knowledge

16  one way or the other on that one.

17  Q.  You haven't reviewed any witness statements in this case on

18  whether or not he saw a potential shooter or a firearm?

19  A.  I am aware that individuals on the golf course, some of

20  them did say that, to your point, that they did not see the

21  shooter.  I think there was only a couple of people who were on

22  that region of the golf course, from my understanding.

23  Q.  Okay.  So besides the Secret Service agent who swept the

24  course, are you aware of anybody else -- and obviously the

25  civilian who took the plate when the individual was crossing

1   the street -- are you aware of anyone else seeing the potential

2   shooter?

3   A.  I personally am not.

4   Q.  Okay.  Where the firearm was recovered at the fence line to

5   where the green is on the fifth hole, what is that distance?

6   A.  I would have to guess.

7   Q.  What's your range?

8   A.  I would say -- this is a guess.  I mean, I have been out

9   there.  I have seen it.  I am going off of an eyeball.  I know

10  our evidence folks are going to have a pretty accurate one, but

11  that would be on an official report.

12          You want me to guess?

13  Q.  Yes, please.  That's what I asked.

14          MR. DISPOTO:  Your Honor, excuse me.

15          THE COURT:  Yes.

16          MR. DISPOTO:  I would ask the witness not to guess.  I

17  think it's fair for him to make estimates based upon his own

18  personal knowledge, but guessing is just not sufficiently

19  reliable to provide any relevant testimony for this court.  So

20  if the witness can estimate, that's fine, but I would ask the

21  court to instruct him not to guess.

22          MS. SIHVOLA:  I will ask a followup question.

23          THE COURT:  Okay.  Ask your followup.

24  BY MS. SIHVOLA:

25  Q.  Did you -- or do you know anyone with a range finder that

1   looked from where the firearm was located to the fifth hole

2   green?

3   A.  I think you are referring to the sixth hole green.

4   Q.  No.  I am referring to the fifth hole green compared to

5   where the rifle was.

6           Did anyone ever use a range finder?  Did you?

7   A.  I did not.  I am not sure if anybody did.

8   Q.  Okay.  Are you aware of anybody who measured that distance

9   at all?

10  A.  I am not sure if that was measured.

11  Q.  Okay.  And you have looked at a map of this golf course,

12  correct?

13  A.  I am looking at one right now.

14  Q.  Okay.  But you in the past had looked at one?

15  A.  Earlier this week.

16  Q.  Right.  And when you looked at the map and spoke to other

17  individuals on scene, what would be your best educated guess in

18  terms of distance from rifle position to the sixth green?

19  A.  You want me to estimate for the sixth green or the fifth

20  green?

21  Q.  I'm sorry.  From where the rifle position was to the green

22  on the fifth hole.

23          THE COURT:  The green on the fifth hole, to be clear,

24  is the one at the top right of the photo, correct?

25          THE WITNESS:  Yes, sir.

```
 1                THE COURT:  The green on the sixth hole would be the
 2    one much closer to the fence line, correct?
 3                THE WITNESS:  Yes, your Honor.
 4                THE COURT:  So you are asking about the further-away
 5    green, correct?
 6                MS. SIHVOLA:  Correct.
 7                THE COURT:  If you can estimate.
 8                THE WITNESS:  You want me to estimate?
 9                THE COURT:  Sure.
10    BY MS. SIHVOLA:
11    Q.  Yes.
12    A.  I don't even know if that's a par 4 or a par 5.  I would be
13    estimating off of prior knowledge of golfing on an estimate
14    here.
15                THE COURT:  If you can't give an estimate, then you
16    can't.  But she's asking if you can, you can give it to me.
17    But if you feel you can't, then don't.
18                THE WITNESS:  Your Honor, I don't think I can
19    accurately estimate from looking at this.
20                MS. SIHVOLA:  Then I will move on.
21                THE COURT:  Go ahead.
22    BY MS. SIHVOLA:
23    Q.  So I want to discuss whether or not this was a scheduled
24    appearance for Donald J. Trump.
25                Was it known that he would be at this golf course?
```

```
 1              MR. DISPOTO:  Objection.  Relevance.
 2              MS. SIHVOLA:  Your Honor, they are alleging the
 3    attempted assassination, and so part of that would be whether
 4    or not the public would have known if he would have been there
 5    to potentially plan this.
 6              THE COURT:  What's your response, government?
 7              MR. DISPOTO:  Judge, this is calling for speculation
 8    with respect to, even if it wasn't scheduled, whether Mr. Routh
 9    based on his own personal surveillance would have seen a
10    caravan of vehicles pulling up to the golf course two hours
11    earlier.  So whether it was planned or not planned is not
12    relevant.
13              MS. SIHVOLA:  I believe that's a separate question
14    that the government may have for themselves, but my question is
15    whether or not it was a scheduled or planned event known to the
16    general public.
17              THE COURT:  You can answer, if you know.
18              Overruled.
19    A.  I am not aware if there was a public event that he was
20    attending.  I don't know what -- I personally do not know what
21    his schedule was that day, and I do not know if it was of
22    public knowledge.
23    BY MS. SIHVOLA:
24    Q.  Are you aware if that golf course had been swept by Secret
25    Service before former President Donald J. Trump got onto the
```

1    golf course?

2            MR. DISPOTO:  Objection.  Relevance.

3            THE COURT:  Sustained.

4    BY MS. SIHVOLA:

5    Q.  The first notification that you were ever aware of that

6    anybody saw a person near a firearm was based on that Secret

7    Service agent; is that correct?

8    A.  Yes, ma'am.

9    Q.  And that was only done, to your knowledge, when he was --

10           MS. SIHVOLA:  Could I use "he"?  Did we establish

11   gender?  I'm sorry, your Honor.  Did we establish gender?

12           THE COURT:  Who are we talking about?

13           MS. SIHVOLA:  The Secret Service agent.  I can't

14   remember, but...

15   BY MS. SIHVOLA:

16   Q.  He or she, when they were sweeping the sixth hole, that was

17   the first time that anybody had noticed this person with a

18   firearm; is that correct?

19   A.  Yes.  To my understanding, yes.

20   Q.  Okay.  The agent, according to the government's proffer,

21   first saw a partially obscured face of the man in the brush

22   line along the fence line, according to the proffer.

23           What part of the face did the agent see?

24   A.  I am not aware of those details.

25   Q.  Okay.  Was there any post-incident identification from that

1    Secret Service agent regarding Mr. Routh?

2    A.  Can you redo that question?

3    Q.  After this all happened, did Mr. Routh and the Secret

4    Service agent ever meet each other where the Secret Service

5    agent says, yep, that's him?

6    A.  There was a single photograph shown to the agent.

7    Q.  Okay.  And that single photograph would have been, like, a

8    prior booking photograph of Mr. Routh?

9    A.  I am not sure exactly of the origin of the photograph that

10   they used.

11   Q.  Okay.  You don't know how old it is?

12   A.  I am not aware of that.

13   Q.  Okay.  And are you aware of what the agent stated upon

14   looking at that photograph, if the agent was certain that it

15   was him or not certain that it was him?

16   A.  We would have to review the 302 to get the exact wording on

17   what the agent stated.

18   Q.  Okay.  Do you know in general what the agent stated when

19   looking at a photograph of Mr. Routh?

20          MR. DISPOTO:  Objection.  Asked and answered.

21          THE COURT:  Can you answer it any more specifically?

22   A.  To my understanding, he positively identified Mr. Routh as

23   being the person that he encountered in the tree line.  I don't

24   know what the statement exactly was, but it was an affirmative

25   statement, to my understanding.

```
 1    BY MS. SIHVOLA:
 2    Q.   Did the Secret Service agent previously give any
 3    description of the person that he saw with the firearm?
 4    A.   Are you talking about prior to the interview or during the
 5    interview?
 6    Q.   Prior, during the interview.
 7    A.   Can you give me that question again?
 8    Q.   Let me ask it this way.
 9         So the Secret Service agent fires his weapon, gets on
10    the radio and says, I have just fired at a suspect who is
11    taking off, I fired at a gunman.
12         Does he ever give a description on the radio of the
13    gunman?
14    A.   I am not sure one way or the other.
15    Q.   Okay.  Or before he looks at a picture of Mr. Routh, was he
16    ever given a description of the gunman?
17    A.   I am not sure.
18    Q.   Did the Secret Service agent and the gunman have any
19    conversation?  Were any words exchanged between the two?
20    A.   It's my understanding the Secret Service agent said
21    something to the individual.  I don't know if it was just like
22    a "hey" or trying to get the person's attention.  And I know he
23    says that the individual made some sort of grunting noise back
24    at least once, maybe twice, is my understanding from the
25    interview.  I am not aware of any other dialogue between the
```

1    two.

2    Q.  Okay.  And besides running away, did the Secret Service

3    agent detail any of the movement of the person, like in terms

4    of standing up or rolling over or how they got up?

5    A.  I am not aware of those details.

6    Q.  Okay.

7            MS. SIHVOLA:  If we could show Government Exhibit 2

8    very briefly.

9    BY MS. SIHVOLA:

10   Q.  The government proffered that this rifle was in the line of

11   sight of the Secret Service agent, like pointed at him.

12          Do you know if that rifle had been raised, or had it

13   been in the same exact position that we see it in Exhibit No. 2

14   when the Secret Service agent saw the rifle?

15   A.  You are referring -- yes.  So the Secret Service agent did

16   make a statement to that effect.  I am not sure of the

17   positioning of the rifle at that time.

18   Q.  Okay.  Are you aware if this rifle was stationary at the

19   time that the Secret Service agent had seen in it terms of it

20   wasn't lifted off the ground at all?

21   A.  I just stated, I do not know how the rifle was oriented, if

22   it was laying down like this or if it was up.  I know at one

23   point the Secret Service agent describes the rifle barrel

24   moving after -- as the agent is moving, he notices the rifle

25   barrel moving.  But I do not have a greater description beyond

1    that statement.

2    Q.  Okay.  So movement, you don't know if it's to left or right

3    or up or down?

4    A.  Correct.  I do not have the knowledge of which way it was

5    being reoriented to.

6    Q.  Or angle?

7    A.  Correct.  I do not know.

8    Q.  So in this picture, we see this dirt path that the

9    government had proffered earlier.

10         Is that where the Secret Service agent had pulled up

11   on the golf cart?

12   A.  Yes.  So the top part of this photo is the dirt path, and,

13   to our understanding, that's the path that the Secret Service

14   agent took.  So it can be assumed that it was right in that

15   general area that the cart path was going.

16   Q.  Okay.

17   A.  The path of the agent's cart.

18   Q.  So the cart path is only within a few feet of this fence?

19   A.  It's further than a few feet.  There is like another

20   subsection of trees, bushes, and then the cart path.

21         MR. DISPOTO:  Your Honor, I am going to object just

22   for clarity purposes.  We are making reference to a cart path,

23   and for those of us that play golf, cart path has a specific

24   significance.

25         I think the witness, though, is also talking about the

```
 1   path of the cart of the Secret Service agent, which may be
 2   different.
 3          So when we talk about cart path, can we just specify
 4   whether we are talking about the actual cart path or the path
 5   of the cart that the Secret Service agent was taking.
 6          MS. SIHVOLA:  Sure.  I will clarify.
 7   BY MS. SIHVOLA:
 8   Q.  Agent, the Secret Service agent was not playing golf at
 9   this time, is that correct, when he was sweeping for potential
10   threats?
11   A.  That's my understanding.
12   Q.  So his movement was not actually limited to this concrete
13   or asphalt cart path that goes around the sixth hole green; is
14   that right?
15   A.  Correct.
16   Q.  Okay.  So I want to talk about physically where the agent
17   actually was.  Okay?
18          So where -- how close -- can you estimate, based on
19   all of the people that you had spoken with and all the reports
20   that you have read, how physically close did the Secret
21   Service's cart come to this fence?
22   A.  It would have been within a few feet of the fence.  There
23   is a path that -- it's kind of like a dirt and grass path right
24   up against the fence line, which I was explaining is to the top
25   part of this photo.
```

```
 1              I would say it's within 5 feet, most likely, would
 2    have been to the fence as he was going west along the fence
 3    line.
 4    Q.  Okay.  And then, according to the government's proffer, he
 5    gets off the cart and then fires several shots, right?
 6    A.  That is the sequence of events, yes.
 7    Q.  And so when he gets off the cart and then he fires the
 8    shots, then he ducks behind a tree and reloads; is that
 9    correct?
10    A.  After firing shots he does seek cover behind a tree.
11    Q.  And it's your understanding that nothing was ever fired at
12    him or her, at the agent?
13    A.  That is to my understanding, yes.
14    Q.  Did the agent ever see the clothing or body parts of the
15    person with the firearm?
16    A.  The agent did get a look at some body parts because he had
17    at least a partial of the face at one point.
18    Q.  Okay.  And so when you say "partial of the face," which
19    part of the face?
20              MR. DISPOTO:  Objection.  Asked and answered.
21              THE COURT:  Sustained.
22    BY MS. SIHVOLA:
23    Q.  For clothing, was there any description of the color that
24    the individual was wearing, color of clothing?
25    A.  I would have to review the report or the statements from
```

1   the agent to get that answer.

2   Q.  Okay.  Are you aware if there was any that he or she

3   observed?

4   A.  I can't give any specifics.  I don't know.

5   Q.  And based on your review from the information that you

6   examined from Mr. Routh and from Secret Service, there are no

7   links to Mr. Routh and Thomas Crooks; is that correct?

8           MR. DISPOTO:  Objection.  Relevance.

9           THE COURT:  What's the relevance?

10          MS. SIHVOLA:  Your Honor, it goes to the government's

11  charge of attempted assassination of former President Donald J.

12  Trump, and it is relevant in terms of the time span between the

13  two events in terms of any potential linkage that they had or

14  did not have to each other.

15          THE COURT:  What's the question again?

16          MS. SIHVOLA:  Is there any link between Mr. Routh and

17  Mr. Thomas Crooks.

18          THE COURT:  Okay.

19          Government, your response.

20          MR. DISPOTO:  Thomas Crooks and the incident that

21  occurred on that prior occasion has nothing to do with this

22  case, and certainly the government has not proffered any

23  information in that regard.  So this is completely irrelevant

24  to these proceedings.

25          THE COURT:  Who is Mr. crooks?

```
 1            MS. SIHVOLA:  He was the one who shot former President
 2    Donald J. Trump on July 13, 2024.
 3            THE COURT:  I am going to sustain that.
 4    BY MS. SIHVOLA:
 5    Q.  So if we can turn to Exhibit 1 again.  I want to talk about
 6    the civilian who, according to the government's proffer, had
 7    seen the gunman running across the street.
 8            According to the government's proffer, the civilian
 9    and who they allege to be Mr. Routh had looked at each other,
10    had made eye contact.
11            Did you review that civilian statement?
12    A.  I am aware that the civilian made that statement, yes.
13    Q.  And was the civilian parked near the vehicle that the
14    person had run across the street and got into?
15    A.  To my understanding, I don't believe that the civilian was
16    parked.  I believe that the vehicle was moving.  I don't know
17    at some point if the civilian parked the vehicle at some point
18    or stopped.
19    Q.  Okay.  Do you know if the civilian was going westbound or
20    eastbound?
21    A.  To my understanding, the civilian was going westbound at
22    one point and then made a U-turn, or turned around, and then
23    reoriented going eastbound.
24    Q.  Okay.  At the time that the civilian claims to have looked
25    at the person that they later identified as Thomas Routh, was
```

1   the person looking in their rearview mirror when they were

2   doing the U-turn at that time?

3   A.  You are asking specifically if that eye contact was made

4   while they were looking in their rearview mirror?

5   Q.  Correct.

6   A.  I am not aware of that, no.

7   Q.  So you are not aware if the person was going east or west

8   or making a U-turn when they were looking at the person running

9   across the street?

10  A.  Correct.

11  Q.  Okay.  Was there any description that the civilian gave of

12  the person that they saw running into the vehicle?

13  A.  You would have to review an official report for that.

14  Q.  You are not aware?

15  A.  I am not aware.

16  Q.  The government's written proffer was that the person was

17  transported to -- actually, before that.

18          Did that civilian ever see any firearm?

19  A.  I do not believe that they physically saw the firearm.

20  Q.  Okay.  The person who was running across the street, did

21  the civilian see them wearing any gloves?

22  A.  I am aware that the civilian said something to the effect

23  that the individual ran across the street, placed a black

24  object into the sunroof, and then entered the black SUV before

25  leaving.  But I am not sure if there was any statement about

1   gloves.  I just don't know.

2   Q.  Okay.  Based on the search of the vehicle later on, do you

3   have any idea what the black object into the sunroof may have

4   been?

5   A.  No, I am not.

6   Q.  Did they give any further description of that object in

7   terms of size, shape?

8   A.  I am not aware of it, but that's not to say that there

9   wasn't.

10  Q.  And when you say they placed an object into the sunroof,

11  was that after the gunman went into the car or was on the

12  exterior part of the vehicle?

13  A.  My understanding is that the civilian observed the

14  individual cross the street from outside the vehicle, set

15  something into the sunroof, and then enter the vehicle.  That

16  was my interpretation of what I was told.

17  Q.  Okay.  Was anything ever collected from any of these

18  roadways that could have fallen off the vehicle?

19          MR. DISPOTO:  Objection.

20          THE COURT:  Response?

21          MS. SIHVOLA:  Your Honor, it goes to the physical

22  evidence linking -- that the government has proffered in terms

23  of the vehicle on scene which they are claiming is the same

24  vehicle that was found in Martin County.

25          THE COURT:  You can answer.

1    A.  Can you ask me that question again, please?

2    BY MS. SIHVOLA:

3    Q.  Yes.  To your knowledge, was there any evidence recovered

4    from any of these roadways from where the suspect vehicle was

5    parked initially to where Mr. Routh was stopped in Martin

6    County?

7    A.  So any evidence collection, I am not sure of all the

8    evidence that was collected.  I believe there was potentially

9    what appeared to be a red liquid substance, possibly blood,

10   that was in the street that was collected.  But we do not know

11   if it had any bearing on this incident or if it was unrelated.

12   Q.  Okay.  But nothing beyond that?

13   A.  Correct, to my knowledge.

14   Q.  Okay.  In the government's proffer they stated that the

15   civilian had been transported from the scene here in Palm Beach

16   County all the way up to Martin County; is that correct?

17   A.  That's correct.

18   Q.  And that transportation was done by helicopter?

19   A.  That is correct.

20   Q.  And when the person got to Martin County, that person was

21   presented with Mr. Routh for a post-incident identification?

22   A.  Yes.  Mr. Routh was there.  They were trying to identify if

23   the witness saw him, yes.

24   Q.  Okay.  And the witness did positively ID him; is that

25   correct?

1    A.  Correct.

2    Q.  Okay.  And did the witness express any certainty?

3    A.  Yes.

4    Q.  What was their level of certainty that they stated?

5    A.  We would have to go back.  I believe it's all on body

6    camera footage, the exact wording, but I know somewhere in that

7    statement 99.9 percent sure was relayed.

8    Q.  And where was that person physically in terms of Mr. Routh?

9    Was that person in a vehicle when they picked up Mr. Routh?

10   A.  My understanding is that they were in a vehicle to protect

11   the witness.

12   Q.  And how far away was that vehicle from Mr. Routh when they

13   made that identification?

14   A.  We would have to refer to an official report of body camera

15   footage for that.

16   Q.  You were not aware if they were like a block away when they

17   made that identification?

18   A.  That's correct, I am not aware.

19   Q.  I want to discuss the firearm that was recovered in this

20   case.

21        Was there only one firearm recovered in this case?

22        MR. DISPOTO:  Objection.  Is counsel referring to at

23   the scene or anywhere in any other locations?

24        I have no objection if it's asked about the scene, but

25   if it's other locations, that might be objectionable.

```
 1              THE COURT:  Is that your question?
 2              MS. SIHVOLA:  Let me narrow it down.
 3     BY MS. SIHVOLA:
 4     Q.  At the golf course, was there any firearm recovered there
 5     besides the one that we have a picture of?
 6     A.  The Secret Service agent's firearm, I am not sure if we
 7     took it from the golf course area.
 8     Q.  So besides those two at the scene, any other firearms
 9     recovered from the scene?
10     A.  No, not to my knowledge.  No.
11     Q.  What about in Martin County when the vehicle was searched,
12     was there any firearms recovered from the vehicle?
13     A.  No, there were not.
14     Q.  Okay.  The firearm that was found on scene here that we
15     have been talking about, it's an SKS style 7.62 x 39-caliber
16     rifle, correct?
17     A.  It's an SKS style rifle.
18     Q.  Right.
19     A.  That's the ammunition that it takes.
20     Q.  Right.
21              Now, the SKS doesn't normally come with a scope on it;
22     is that correct?
23              MR. DISPOTO:  Objection.  Calls for speculation.
24              MS. SIHVOLA:  If he is aware of firearms.
25              THE COURT:  If you are aware, you can answer.
```

1    A.  I have training and experience in firearms.  I am not

2    well-versed in SKS style rifles to answer that question.

3    BY MS. SIHVOLA:

4    Q.  Okay.  From what you have seen, have you ever worked on

5    cases where an SKS is recovered?

6            MR. DISPOTO:  Objection.  Relevance.

7            MS. SIHVOLA:  It goes to his knowledge.

8            THE COURT:  I am going to sustain that.

9    BY MS. SIHVOLA:

10   Q.  Have you ever worked cases where a rifle is ever recovered?

11           MR. DISPOTO:  Objection.  Relevance.

12           THE COURT:  What's the point you are going to try to

13   make with this?

14           MS. SIHVOLA:  So I want to go to the electrical tape

15   on the scope.  So I will ask about that, your Honor.

16           THE COURT:  Just go to that, please.

17           MS. SIHVOLA:  Okay.

18   BY MS. SIHVOLA:

19   Q.  So the government had proffered earlier that this was a

20   sniper position, war zone, and this is a firearm and ammunition

21   from military around the world.

22           What military uses electrical tape around an SKS to

23   tape their scope on?

24           MR. DISPOTO:  Objection.

25           THE COURT:  What's the relevance there?

```
 1              MR. DISPOTO:  That wasn't proffered.

 2              THE COURT:  What's the point, though, at the end of

 3     the day?  What's the point you are trying to make?

 4              MS. SIHVOLA:  The electrical tape on the scope, I am

 5     asking detailed questions because the government is

 6     representing that this instrument was being used for

 7     assassination purposes, and they are alluding that this is

 8     military grade quality that you find in war zones, and it's

 9     frankly not.

10              MR. DISPOTO:  The proffer had nothing to do with the

11     tape itself.  It was about the firearm.

12              THE COURT:  I understand, but --

13              MR. DISPOTO:  She is asking about tape.

14              MS. SIHVOLA:  I am asking about the quality of the

15     firearm itself, the quality of the scope on the firearm,

16     whether it would have made much of a difference at all.

17              THE COURT:  But why is that relevant?  In other words,

18     the point you may be making is that to the extent he was trying

19     to be an assassin, he was not a very good one?  Is that the

20     point?

21              MS. SIHVOLA:  The capability of it.

22              THE COURT:  That he doesn't know what he is doing?

23              MS. SIHVOLA:  Just the capability of it, your Honor,

24     in terms of an actual specific intent used for attempted

25     assassination.
```

1          THE COURT:  Okay.  I understand the point you are

2     trying to make, but I am going to sustain the objection.  I

3     think you can just argue that later.

4     BY MS. SIHVOLA:

5     Q.  The scope itself, are you able to say if there was any

6     difference between electrical tape versus an actual side

7     mounting in terms of the angle of the scope?

8     A.  I am not sure.  I don't know how to answer your question.

9     Q.  Okay.

10          THE COURT:  I think you are trying to make the point

11     that the scope would not have worked well.

12          MS. SIHVOLA:  That the angle for electrical tape is

13     different than actual side mounting or mounting properly of a

14     scope.

15          THE COURT:  Just to short-circuit this, it's obvious

16     that the scope is taped to the firearm, and we can all draw

17     conclusions about whether that would have worked well or not.

18     So I am not going to allow any more questions on this.  So move

19     to your next point.

20     BY MS. SIHVOLA:

21     Q.  The government proffered that there were 11 rounds in the

22     magazine clip.

23          How many does that hold?

24     A.  I don't have that answer.  I don't know the exact capacity

25     of the magazine.

1  Q.  In your investigation into Mr. Routh, had you made any

2  determination if Mr. Routh had any actual training in firearms

3  or experience with them, like in terms of professional training

4  with them in any capacity?

5  A.  I am aware that it was relayed to me that we did have

6  information that he had some sort of familiarity with firearms,

7  but I cannot tell you the exact source of that or where that

8  came from exactly as I sit here today.

9  Q.  Okay.  What about firearm certifications in terms of, you

10  know, in the State of Florida you have to be -- well, you used

11  to, but some of us have license to carry, or we have our

12  sportsman's license, or firearms license, just specifically, or

13  hunting license, where there is some type of training involved

14  in firearms.

15          Are you aware of any of that in regards to Mr. Routh?

16          MR. DISPOTO:  Objection.  Relevance.

17          MS. SIHVOLA:  Your Honor, again, it goes to intent, it

18  goes to the attempted assassination, if this is an individual

19  who is trained in firearms, who can meet that specific intent,

20  versus a person who is less knowledgeable.  And it goes to the

21  government's representation of his danger to the community.

22          THE COURT:  I hear you.  I am going to let it go a

23  little further, but, again, I am not interested in questions

24  about his level of skill and carrying out these acts so much.

25          MS. SIHVOLA:  This would be the final question in

 1    regards to this.

 2              THE COURT:  Go ahead.

 3    BY MS. SIHVOLA:

 4    Q.  Are you aware of any specific certifications that he's held

 5    in any state across America at any point regarding his

 6    proficiency into a firearm, such as all of those that I had

 7    previously listed?

 8    A.  I personally am not aware of him having any certifications.

 9    Q.  Okay.  I want to move on now to the box that the government

10    had proffered about.

11              And in the box, there was just one letter?

12    A.  I have not gotten to look at the box myself.  I am taking

13    these facts from other agents.  I am not sure how many letters

14    were in the box.  I am aware that there was a letter in the

15    box, though.

16    Q.  Okay.  The letter in the box that the government had used

17    as Exhibit Number --

18              THE COURT:  6.

19              MS. SIHVOLA:  Exhibit No. 6, if we could pull that up

20    very briefly.

21    BY MS. SIHVOLA:

22    Q.  Have you read Government's Exhibit No. 6?

23    A.  I have read this letter, yes.

24    Q.  Okay.  Now, in evidence we only have one page of it.

25              How many pages was it?

1   A.  I am not sure how many pages it is in full.  I am going

2   to -- I believe it's two, but I am not 100 percent on that.

3   Q.  Okay.  Are you aware of any letters being more than two

4   pages?

5           THE COURT:  Any letters found in the box?

6           MS. SIHVOLA:  Yes.

7   BY MS. SIHVOLA:

8   Q.  Yes, found in the box that we are talking about, being more

9   than two pages long.

10  A.  Again, I have not actually gotten to see this box or the

11  letters.

12  Q.  But you had discussed your testimony today, you discussed

13  the proffer with the government before you testified today to

14  prepare yourself for this testimony, correct?

15  A.  Correct.

16  Q.  And part of the proffer, including in their written proffer

17  agreement that you read, was this letter; is that right?

18  A.  That's correct.

19  Q.  Okay.  And upon reading that proffer, knowing that that

20  information would be given to Judge McCabe today, you made

21  yourself aware of that letter, right?

22  A.  Correct.  I already stated that I read this letter.

23  Q.  You read this letter in particular?

24  A.  This photograph that you were looking at, yes.

25  Q.  Okay.  So this is only one page of that letter, correct?

```
 1   A.   Correct.

 2   Q.   This is not the full letter, right?

 3        So in addition to this one page, did you read any

 4   other pages of this letter?

 5   A.   My recollection is that there is another page.  I would

 6   have to review the information from the other agents, though,

 7   to get that.

 8   Q.   Let me ask you this.  Was there any information in this

 9   letter in particular that there was a planning of failing or

10   information that this would not have worked?

11             THE COURT:  You mean --

12   BY MS. SIHVOLA:

13   Q.   The assassination attempt would not work, it would fail,

14   this person would be held in custody.

15             THE COURT:  You are asking him whether on the second

16   page of this letter there was any such indication?

17             MS. SIHVOLA:  Any part of the letter in any box -- or

18   this letter on the second page, et cetera, was there any

19   information on the second page of this letter that the

20   assassination attempt would fail.

21             MR. DISPOTO:  Your Honor, I am going to object because

22   I don't believe counsel has established the witness is even

23   familiar with the contents of the second page.

24             THE COURT:  Let's let him answer.

25             You can answer.  I am overruling the objection.  You
```

```
 1    can answer, if you can.

 2            THE WITNESS:  I wouldn't be able to tell you what was

 3    on the second page as I sit here now.  I'd have to review the

 4    letter.

 5    BY MS. SIHVOLA:

 6    Q.  If I showed you a copy of it, would that refresh your

 7    memory?

 8    A.  Yes, it would.

 9            MS. SIHVOLA:  Just for memory, recollection purposes,

10    I am showing him the other page.

11            May I approach the witness?

12            THE COURT:  Yes.  But to the extent you are asking him

13    to opine what's on the first page of the letter, of course we

14    can all draw our own conclusions about that.

15            I think your question is, you are going to show him

16    that to refresh his recollection, whether he can remember any

17    other portions or any other letters that might indicate that

18    the defendant intended the attempt to fail.

19            Is that the question?

20            MS. SIHVOLA:  Yes, your Honor.

21            I will just clarify for the court.  The prosecution

22    has given us subsequent pages to this letter, and that's what I

23    want to show to the agent.

24            THE COURT:  You are showing him the other pages?

25            MS. SIHVOLA:  Yes.
```

```
 1                THE COURT:  Okay.  Go ahead.
 2                MS. SIHVOLA:  May I approach?
 3    BY MS. SIHVOLA:
 4    Q.  If you could read over those other pages and let me know if
 5    that refreshes your memory.  And read to it yourself, please.
 6    A.  Do you want me to read this in full?
 7                THE COURT:  Tell us whether your memory has been
 8    refreshed, and then you can answer her question, but don't just
 9    read the letter into the record.
10                THE WITNESS:  Okay.
11                (Witness perusing document.)
12    BY MS. SIHVOLA:
13    Q.  And, sir, were those additional pages of that letter?
14    A.  It appears so, yes.
15    Q.  Okay.  And the pages are marked on the top right corner 8
16    and 11?
17    A.  That's what it looks like here.
18    Q.  So you would agree with me that the contents of this letter
19    discuss his failed attempt, and it would "at least make a few
20    people stop and think for a moment how wonderful our freedom
21    and democracy are."
22                Correct?
23    A.  That's what it looks like it says here.
24    Q.  Okay.  "If we can set aside the normal day-to-day luxury
25    life for a moment and get active in helping preserve our
```

```
 1   wonderful country."

 2          Correct?

 3   A.  It looks like that's what it says here on the bottom of the

 4   second page.

 5          THE COURT:  I'm sorry.  Are you offering those other

 6   pages in, or you are just relying upon his testimony of what he

 7   remembers from it?

 8          MS. SIHVOLA:  At this point, we will just rely on the

 9   testimony, your Honor.

10          THE COURT:  That's fine.

11   BY MS. SIHVOLA:

12   Q.  You would agree with me that on the third page of this

13   document, or in some point in the contents of this document,

14   that the author discusses, "While I sit at the big house, I am

15   willing to pay the price," et cetera.  "Even if I fail yet

16   again," and then there was talk about "please come visit me

17   with letters to help pass the time."

18          Is that correct?

19   A.  I mean, I see the part about "pay that price."  You can

20   point me to the other parts that you just read, but...

21   Q.  You agree that in this letter it discusses failed attempts,

22   right?

23   A.  Yeah.  The word "failed" is in here a couple of times.

24   Q.  Okay.  And "attempt" is, right, "failed attempt?"

25   A.  It appears he is discussing the failed attempt, yes.
```

1   Q.  And for this letter itself, was any handwriting done,

2   analysis, just on this letter itself?

3   A.  No, there has not been a handwriting comparison or

4   anything.

5   Q.  Okay.  And are you aware if there are other pages to this

6   letter that we just don't have at this point?

7   A.  I am not aware.

8   Q.  When I say "this point" --

9   A.  One way or the other, I don't know either way.

10  Q.  So you had been referring to federal reports that were made

11  that you had reviewed.

12         You would agree that right now at this point the

13  defense doesn't have access to those reports that you are

14  relying on; is that correct?

15         MR. DISPOTO:  Objection.  Relevance.

16         MS. SIHVOLA:  In terms of my ability to show him these

17  documents, your Honor, I don't have that ability.  This is

18  basically the only information that we have to refresh his

19  memory.

20         THE COURT:  Well, I think the court understands that

21  point, but you can answer.

22         Go ahead.

23         THE WITNESS:  Can you ask that question again, please?

24  BY MS. SIHVOLA:

25  Q.  So previously, on numerous occasions throughout your

1  testimony, you kept referring to look at these reports, see

2  these reports.

3        All of those reports that you have mentioned, the

4  defense doesn't have access to them at this time; is that

5  correct?

6  A.  I don't believe you guys have received any reports, no.

7  Q.  Okay.  So all of those reports in evidence, that's in the

8  federal government property without the ability for the defense

9  to bring that to your attention right now; is that fair to say?

10 A.  There are some reports that are in there, yes.

11 Q.  I'm sorry.  Some reports that are?

12 A.  There are some reports in the government's custody, yes.

13 We are still finalizing some reports.  There's some that are

14 finalized.

15 Q.  They are not in defense possession or custody or ability to

16 access at this time; is that fair to say?

17 A.  To my knowledge, yes.

18 Q.  Thank you.

19        On the first page of the letter there's mention of

20 $150,000.

21        Are you aware of Mr. Routh's finances, whether or not

22 he actually has access to $150,000?

23 A.  I am aware we have financial information.  I am not aware

24 of what's in the financial information.  I have not reviewed

25 it.

1    Q.  Okay.  So I want to turn to the serial number on the rifle

2    at scene.

3         Was the federal government able to read any of those

4    serial numbers?

5    A.  From the photo that's up here?

6    Q.  Yes.

7         MS. SIHVOLA:  If we can go to Government's Exhibit No.

8    4, please.

9    BY MS. SIHVOLA:

10   Q.  Was the federal government ever able to read any of those

11   serial numbers?

12   A.  Ever able to read them?

13   Q.  Yes.  Did you use any assistance, like electrochemical

14   action, magnetization?

15   A.  My understanding is that the lab was able to recover eight

16   out of the nine characters.

17   Q.  Okay.  And based on the eight out of the nine characters

18   and the model and make of the rifle, were you able to do any

19   trace of it or anything like that?

20   A.  I would say that's ongoing at this time.

21   Q.  Okay.  So you are not aware of the origin of this firearm

22   in terms of where it was acquired from?

23   A.  I would think that that's still ongoing, the trace that you

24   are speaking of.

25   Q.  Okay.  Are you able to ascertain if this firearm was used

1   in any other offense?

2           MR. DISPOTO:  Objection.  Relevance.

3           MS. SIHVOLA:  It goes to identity of who had this

4   firearm.

5           THE COURT:  I think you have already testified that

6   the trace is ongoing.  So my belief would be you are probably

7   going to say you don't know.  Is that right?

8           THE WITNESS:  That's correct.  It's ongoing.  I don't

9   think we have established that information one way or the

10  other.

11          MS. SIHVOLA:  I will move on.

12  BY MS. SIHVOLA:

13  Q.  I want to talk about the stop of Mr. Routh in Martin

14  County.

15          You said that you were able to review that body camera

16  footage.

17  A.  I was able to review --

18  Q.  Some --

19  A.  -- some portions of it.  There was a lot of body camera

20  footage.

21  Q.  There was a little bit of the footage that was released by

22  Martin County on Facebook.

23          Would you agree with me that when Mr. Routh was

24  stopped, he was instructed to put his hands outside of the

25  vehicle?

1  A.  I am not aware of the commands that were given during that

2  time frame.  I did see some images and some video of officers,

3  you know, conducting a felony car stop or a high-risk car stop.

4  Q.  Would you agree with me that the officers issued commands

5  for him to exit the vehicle and back up?

6  A.  I didn't review the commands.  I didn't watch that portion

7  of it to hear exactly what the commands were.

8  Q.  You were aware commands were issued, and Mr. Routh followed

9  all of those commands; is that fair to say?

10  A.  To my understanding, the subject did comply with commands

11  overall.

12  Q.  You are not aware of Mr. Routh running from the police

13  after he stepped out of the vehicle?

14  A.  Correct.

15  Q.  Fighting with the police of any manner?

16  A.  Right.

17  Q.  You are not aware of any endangerment of the vehicle to

18  other drivers on 95?

19  A.  I don't know exactly how he was driving on 95.  But I was

20  not aware of any injuries or anything like that that happened.

21  Q.  There were no other civilian calls of this vehicle in

22  question doing any erratic driving; is that fair to say?

23  A.  Not to my knowledge.

24  Q.  Okay.

25        MS. SIHVOLA:  If we could pull up Government Exhibit 5

1    that has the map.

2    BY MS. SIHVOLA:

3    Q.  Would you agree with me that in this map in

4    Government Exhibit 5, that these time frames are approximately

5    correct, that the suspect fled at approximately 1:31 p.m. and

6    was arrested at approximately 2:15 p.m.?

7    A.  Approximate.

8    Q.  And you would agree with me that a person driving from

9    Trump International Golf Club could reach where Mr. Routh was

10   stopped close to Exit 110, Martin Highway, who was driving the

11   speed limit?

12          MR. DISPOTO:  Objection.  Calls for speculation.

13          THE COURT:  What's your response?

14          MS. SIHVOLA:  Let me clarify if he's ever made that

15   drive before.

16   BY MS. SIHVOLA:

17   Q.  Agent, have you ever made the drive from West Palm to

18   Martin County before?

19   A.  I have.  There's several different exits, though, depending

20   on time frame and whatnot.  Again, it would -- there's going to

21   be a big estimate here.

22   Q.  Okay.  But you would agree with me that a person could

23   reasonably get from the Palm Beach County area to Martin County

24   in approximately that time frame of 45 minutes?

25          MR. DISPOTO:  Again, your Honor, calls for speculation

1    and relevance.

2              MS. SIHVOLA:  Your Honor, the government is -- one of

3    their allegations for pretrial detention is flight, and so I

4    think path of travel, manner of travel, that there was no

5    erratic driving, no actual speeding, as there was also a claim

6    of the person going at a high rate of speed.  And I have made

7    this drive myself, your Honor.

8              THE COURT:  Is your point merely that you can get from

9    one point to the other without going at an excessive rate of

10   speed?

11             MS. SIHVOLA:  Correct.

12             THE COURT:  I myself have made the drive, and I will

13   take judicial notice of that.

14             MS. SIHVOLA:  Thank you, your Honor.  Moving on.

15   BY MS. SIHVOLA:

16   Q.  In the phone analysis, you said that the phones in the

17   vehicle were still being analyzed and you don't have a full

18   analysis back; is that right?

19   A.  That's correct.

20   Q.  Okay.  And according to one Google search on the phone, the

21   government proffered that there was information on how to

22   travel from Palm Beach County to Mexico; is that correct?

23   A.  That's correct.

24   Q.  Do you know when that search was made?

25   A.  I am not sure as I sit here today what date that was.

```
 1   Q.   Okay.   Were there other Google searches on the phones?

 2   A.   There were other Google searches.

 3   Q.   What were those of?

 4             MR. DISPOTO:   Objection.   Relevance.

 5             MS. SIHVOLA:   Your Honor, the government proffered one

 6   Google search as evidence, to show evidence of Mr. Routh's

 7   flight risk.   I think it's important to know the context of the

 8   total number of searches on that phone in terms of directions

 9   to different locations, when they were made.   If it was made

10   five years ago, it's frankly not relevant.

11             THE COURT:   I hear you.

12             Agent, you can answer in general, but I don't want to

13   go too deep down the rabbit hole of all the searches that may

14   have been made on this phone.

15             MS. SIHVOLA:   So let me clarify.

16   BY MS. SIHVOLA:

17   Q.   In terms of directions or plugging in other areas, were

18   there other areas that were searched in terms of directions to

19   get there, if you are aware?

20   A.   I am not sure of the extent of general directions that are

21   programmed into the phone.   I know that there was the search

22   that you are speaking of from Palm Beach to Mexico.   I believe

23   there was one other one from Miami to Mexico in the same

24   general time frame.   But outside of that --

25   Q.   But you don't know when that time frame is?
```

```
 1    A.  It was -- I can give you an approximate.

 2    Q.  Is it a guess?  Because we don't want you to guess.  So

 3    let's move on.

 4          The cell phone towers for the two phones, the

 5    government proffered that between August 15 and September 15

 6    that two of the phones found in the vehicle were near cell

 7    phone towers near Trump International Golf Course and former

 8    President Donald J. Trump's former residence at Mar-a-Lago; is

 9    that correct?

10    A.  Was it the 15th or the 18th?

11    Q.  15th.

12          THE COURT:  Well, whatever the proffer was.

13    BY MS. SIHVOLA:

14    Q.  The government had proffered in their written proffer:  "On

15    multiple days and times from August 18th until September 15th,

16    Routh's cell phone accessed cell towers located near the Trump

17    International and former President's residence at Mar-a-Lago."

18    A.  So it's the 18th, yes.

19    Q.  August 18th to September 15, correct.

20          So how many days from that month, we will just say a

21    month time period, did the cell tower hit near the cell phone

22    tower that was close to Mar-a-Lago?

23    A.  I can't give you a number on that.

24    Q.  Could it have been one time?

25    A.  It could have been one time; it could have been more.
```

1   Q.  The cell phone tower, what is the range of that tower?

2   A.  You would have to --

3           MR. DISPOTO:  Objection, Judge.  If the witness can

4   even testify to that.

5           MS. SIHVOLA:  If he has knowledge.

6           THE COURT:  If you know.

7           THE WITNESS:  I don't have the exact knowledge on the

8   distance.

9   BY MS. SIHVOLA:

10  Q.  Are you aware that cell phone towers in general can cover

11  miles of area?

12  A.  I am aware that there are some ways of getting the data

13  where it would encompass a large radius.  I know there is other

14  data that you can get that is very precise.

15  Q.  Do you know if this is precise data or if this is general

16  cell phone towers?

17  A.  My understanding is that these are precise.

18  Q.  Okay.  So you would agree with me it's not GPS data?

19  A.  I don't think that I am able to give you an answer on that.

20  I don't know what pings we actually have here.

21  Q.  So you are just not knowledgeable about the range of these

22  towers or any precision, in terms of location, where these cell

23  phones would have been in contact in terms of proximity to cell

24  towers?

25  A.  Across the board I am not going to be able to give you down

```
 1   to a radius on how precise or not precise they are, no.
 2   Q.  Okay.  And you don't know how many other businesses could
 3   be encompassed in this range as well?
 4   A.  No.
 5   Q.  I know I asked you about Mar-a-Lago.  What about the Trump
 6   International Golf Course.  How many times did that ping near
 7   those cell phone towers?
 8   A.  I know there were several.
 9   Q.  Okay.  So beyond several you can't estimate a specific
10   number?
11   A.  I don't want to give a specific number, no.
12   Q.  Okay.  So you would agree with me that Trump International
13   is located near major roads in West Palm; is that correct?
14   Summit and Congress are major roads in West Palm Beach?
15   A.  You are talking about Trump International Golf Course?
16   Q.  The golf course, correct.
17   A.  I mean it's, yeah, at the intersection of Summit and
18   Congress.
19   Q.  So you would agree with me that many people who travel in
20   West Palm would also be connecting to those towers if they are
21   driving past on Summit and Congress?
22           MR. DISPOTO:  Objection.  Calls for speculation and
23   relevance.
24           THE COURT:  I understand the point.
25           The point is that these are major roads, correct?
```

```
 1              MS. SIHVOLA:  Yes.

 2              THE COURT:  All right.  I am going to sustain the

 3    objection, but I understand the point.  You can make that

 4    argument as part of your argument.

 5              Go ahead.

 6    BY MS. SIHVOLA:

 7    Q.  There were 12 gloves that were found in the vehicle.

 8              Were those work gloves?

 9    A.  I understand that there was a different description on

10    several different gloves in the inventory.  I am not able to

11    tell you exactly which gloves are what or what those

12    descriptions were, but I know there were several different

13    types of gloves, from my understanding.

14    Q.  Okay.  And there is no evidence that any gloves were used

15    in this case; is that fair to say?  They could have just been

16    for work purposes for all we know?

17              MR. DISPOTO:  Objection.  Calls for speculation.

18              MS. SIHVOLA:  If he is aware if there's any evidence

19    connecting these gloves to the shooter.

20              THE COURT:  Go ahead.

21    BY MS. SIHVOLA:

22    Q.  Are you aware if there's any evidence connecting these

23    gloves to the shooter?

24    A.  Are you saying did anybody see the shooter wearing gloves?

25    Q.  Or any physical evidence connecting them to the scene,
```

```
 1   anything that the federal government has that you are aware of
 2   connecting these gloves to the shooter -- or, I'm sorry, the
 3   person was with the firearm?
 4   A.  I mean, they were in the vehicle.
 5   Q.  Right.  So besides being in the vehicle, there was no
 6   evidence that gloves were on scene or being used by the person
 7   with the rifle?
 8   A.  I am not sure if we have any DNA or fingerprint hits off of
 9   anything on those gloves, if that's what you are asking.
10   Q.  I am asking if there's any evidence that there was any
11   gloves ever used by the person with the gun.
12   A.  I don't think anyone saw the person in question with
13   gloves, or I don't think that was even noted.
14   Q.  In the vehicle itself, the federal government has recovered
15   Mr. Routh's passport and driver's license; is that correct?
16   A.  Inside the vehicle, yes.
17   Q.  Yes.  And these are valid documents?
18   A.  To my knowledge, yes, I believe so.
19   Q.  They are not false identification?
20   A.  I haven't actually seen them or put hands on them.  It
21   hasn't been relayed to me that they are false.
22   Q.  Let me ask you this.  Is there any evidence that Mr. Routh
23   possessed any false identification whatsoever?
24   A.  Not that I am aware of.
25   Q.  Okay.  The documents that were found in the vehicle, there
```

```
 1    was notes about August, September, and October of 2024 of

 2    venues where former President Donald J. Trump appeared or was

 3    expected to appear.

 4              What were those venues?

 5              MR. DISPOTO:  Objection.  Relevance.

 6              THE COURT:  What is the relevance?

 7              MS. SIHVOLA:  Your Honor, for the alleged

 8    assassination attempt, the federal government is using this --

 9    first of all, this was their proffer, and I am asking details

10    about something that they already proffered about.  So it's

11    inappropriate for them to proffer and to preclude the defense

12    from asking details about their proffer.

13              But second of all, for the attempted assassination

14    they are alleging that Mr. Routh was documenting where

15    President Trump was to potentially be at these areas, to do

16    surveillance.  So we have a right to know what those areas were

17    and if there's any accuracy to what the government is

18    purporting, to knowledge of surveillance, is it even accurate,

19    was he even there.

20              THE COURT:  I will allow it, but I don't want to go

21    too far with this because, again, this is -- I am allowing you

22    to inquire into the strength of the evidence, but we are

23    getting -- and I understand the government made a wide-ranging

24    proffer, which is why I am letting you go so far, but let's

25    limit it, please.
```

```
 1           MS. SIHVOLA:  Yes, your Honor.
 2   BY MS. SIHVOLA:
 3   Q.  So for these documents, in terms of the venues where former
 4   President Donald J. Trump either appeared or was expected to
 5   appear, that were written down for October, September -- it
 6   would have been October and September -- did former President
 7   Donald J. Trump actually appear at any of those venues?
 8   A.  I am not sure if he actually appeared at those venues.  I
 9   don't know.
10   Q.  Do you have any evidence at all that Mr. Routh went to any
11   of those?
12   A.  I personally -- as I sit here today, I am not sure of that
13   answer.
14   Q.  Okay.  Do you know the number of venues that had been
15   written down?
16   A.  I would need to refresh my memory for an exact number.
17   Q.  Can you give an educated estimate based on the reports?
18   A.  I think there was, from my recollection, maybe four or five
19   line items that were written, that I think that's what you are
20   referencing.
21   Q.  In the notebook that was recovered, there was information
22   about Ukraine and criticizing China and Russia, like
23   anticommunist, pro-democracy philosophy; is that correct?
24   A.  I would need to review those to give you the exact of what
25   was put on there.  I know there was like a fight for Ukraine
```

1    written on there several times, and then the names and phone

2    numbers, like you already stated.

3    Q.  Okay.  In the government's written proffer, they stated a

4    notebook with dozens of pages filled with names and phone

5    numbers pertaining to Ukraine, discussions on how to join

6    combat on behalf of Ukraine, and notes criticizing the

7    governments of Russia and China.

8          Is that correct, that there were notes criticizing the

9    governments of Russia and China?

10   A.  I believe so.  I would have to reference the notes again to

11   give you an exact on that.

12   Q.  All of this information is in possession of the federal

13   government; is that correct?

14   A.  Those notes, yes.

15   Q.  Yes.  Not in the possession of the defense to be able to

16   show you these to refresh your memory; is that fair to say?

17   A.  Correct.

18   Q.  There was a discussion in their proffer, both in the

19   written proffer and their oral proffer today, about Mr. Routh's

20   e-book, right?

21   A.  Correct.

22   Q.  And there was a snippet of quotes that the government had

23   recited.

24         Now, that e-book was close to 300 pages; is that

25   correct?

```
 1  A.  I am not sure how many pages it was.  I believe it was a
 2  full book, though.
 3  Q.  And in the book, he talked about the purpose of that book,
 4  right?
 5  A.  I have not reviewed the book.
 6  Q.  Okay.  You would agree with me that it was published on
 7  Amazon last year, in February of 2023?
 8  A.  I know it was sold on Amazon, yes.
 9  Q.  Okay.  Are you aware if it was sold on Amazon for more than
10  a year or so?
11  A.  I don't know the time frame.
12  Q.  Okay.  You would agree with me that a lot of the book
13  focused on Ukraine?
14          MR. DISPOTO:  Objection, Judge.  The witness has
15  already testified he has not reviewed the book.
16  BY MS. SIHVOLA:
17  Q.  Based on reports of other individuals who talked to you
18  about the book.
19          THE COURT:  Can you answer the question?
20  A.  I am familiar with the statement that was in -- that you
21  are referencing, the quote that we have put in there.  I am
22  aware of that.
23  BY MS. SIHVOLA:
24  Q.  You are aware of what the government -- the one quote out
25  of the entire book that the government proffered, that's what
```

```
 1   you are aware of, right?
 2   A.  I am aware of that, yes.
 3   Q.  Okay.  Beyond that one quote in this entire book, you are
 4   not aware of anything else?
 5   A.  Not really.  I did not review the book.
 6   Q.  Okay.  Did they show you the quote from the book, or did
 7   they just tell you that there is a quote in the book?
 8   A.  No.  I reviewed a report that law enforcement put into a
 9   report that had either a summary or the quote.
10   Q.  Okay.  So I want to talk to you about the report that you
11   got that is a summary of the book.
12         So this report that you reviewed, that the defense
13   does not have a copy of, did this report include information
14   about Routh's discussing world leaders, how to set an example
15   of unselfishness and kindness and caring, to sit on the dirt
16   floor with the most common struggling souls, and share their
17   pain and try to make their lives better?
18   A.  I am aware of the quote that we have already previously
19   discussed.  That's what I reviewed out of the report.
20   Q.  So you read one sentence out of the entire report.  You
21   didn't read any of the rest of the report where he is
22   discussing the global importance --
23         THE COURT:  I am going to stop you to short-circuit
24   this.  He said he hasn't read the rest of the book.
25         You are welcome to proffer sections of the book to me
```

1    when it's your turn for purposes of this detention hearing, but

2    let's not keep asking him about it.

3           MS. SIHVOLA:  Yes, your Honor.

4    BY MS. SIHVOLA:

5    Q.  Are you aware of the suspect ever using any camouflage to

6    hide their appearance of any nature in terms of camo fatigues,

7    clothing, pants, anything like that?

8           MR. DISPOTO:  Objection, Judge.  Is counsel referring

9    to the date of his arrest or some other prior occasion?

10          MS. SIHVOLA:  On the day that this all occurred.

11          MR. DISPOTO:  I withdraw the objection.

12          THE WITNESS:  I do not believe camouflage was worn.

13   BY MS. SIHVOLA:

14   Q.  Okay.  And you would agree with me that when Mr. Routh was

15   arrested, he had on kind of like a pink shirt, like an orangey,

16   pinkish shirt?

17   A.  Yes.

18          MS. SIHVOLA:  The court's indulgence.

19          No further questions, your Honor.

20          THE COURT:  Thank you.

21          Government, do you need to redirect?

22          MR. DISPOTO:  Thank you, Judge.

23   REDIRECT EXAMINATION

24   BY MR. DISPOTO:

25   Q.  Good morning, agent.

1    A.  Good morning.

2    Q.  Actually, good afternoon now.

3    A.  We are in afternoon.

4    Q.  Agent Hull, I want to begin my redirect by asking you a

5    little bit about the information that you have reviewed prior

6    to coming into court today.

7            How would you describe, I guess first and foremost,

8    the size of this investigation, as far as the number of law

9    enforcement agents and agencies that are currently working this

10   case?

11   A.  It is substantial.  It is a very large amount of law

12   enforcement that is investigating this and a lot of information

13   coming in.

14   Q.  And how active of an investigation would you say this

15   matter is?

16   A.  Very active.  Around the clock.  I have essentially been

17   working this around the clock, aside from a few hours of sleep

18   here and there.

19   Q.  You mentioned earlier that this investigation is now

20   approximately eight days old; is that correct?

21   A.  Approximately, yes.

22   Q.  And are there many agents employed by the FBI as well as

23   other law enforcement agencies that are collaborating with each

24   other to actively collect information relevant to this

25   investigation?

1   A.  Yes, there is.

2   Q.  How does that information typically come to you?  Does it

3   come to you verbally, or in written form, or some other method?

4   A.  I would say a little bit of both, but primarily, since it

5   is such an active, fast-paced investigation, I have been

6   getting a lot of this verbally.

7   Q.  How would you describe, by the way, your role in the

8   investigation?  Are you one of the lead case agents of this

9   investigation?

10  A.  Yes, I am.

11  Q.  Okay.  Now, you mentioned earlier -- and there's been a lot

12  of questions propounded to you about reports.  Can you tell us

13  typically, report writing, does that happen instantaneously or

14  is that a fluid process that takes time to complete?

15  A.  It's a fluid process definitely depending on what it is

16  that they are reporting.  It can take some time, though.  It's

17  fluid.

18  Q.  And in this case, have some reports been prepared?

19  A.  Yes, there has.

20  Q.  And are there many reports that either have not been

21  prepared yet or have not been finalized?

22  A.  Correct.

23  Q.  Of the reports that exist, I believe you indicated that to

24  the best of your ability you have reviewed them in preparation

25  for court here today?

1   A.  I have reviewed a lot of reports, as many as I can with the

2   short amount of time, plus all the information I am verbally

3   taking in as well.

4   Q.  And I believe you had indicated, though, earlier that most

5   of the information that has come to your attention has come

6   verbally; is that right?

7   A.  That's correct.

8   Q.  Let's talk about the letter from the box.

9          MR. DISPOTO:  Could we pull up that exhibit.

10  BY MR. DISPOTO:

11  Q.  I see that in Government Exhibit 6, defense counsel had

12  questioned you quite a bit about this letter.

13          Do you recall those questions?

14  A.  Yes, I do.

15  Q.  I believe she asked you not only about its content but also

16  about the number of pages of this letter.

17  A.  That's correct.

18  Q.  I see that this appears to be a photograph of the letter,

19  not obviously the actual letter itself; is that right?

20  A.  That's correct.

21  Q.  Does the FBI here in South Florida have in its possession

22  this actual letter yet?

23  A.  We do not.

24  Q.  Okay.  So the information that you receive regarding this

25  letter was actually a photograph of portions of this letter,

1    correct?

2    A.   Correct.

3    Q.   Do you know if the FBI has currently in its possession a

4    photograph of each and every page of this letter?

5    A.   I am not sure if we do.  It's possible, but I am not aware

6    one way or the other.

7    Q.   Is the FBI in the process of trying to get the actual

8    letter here, as far as you know?

9    A.   I believe that is the plan.

10   Q.   Now, in light of the fact that the FBI does not currently

11   have the actual letter in its possession, are you able to

12   testify as to all of the details of its contents?

13   A.   The FBI down here in Miami does not have the letter.  So I

14   am not able to give you a full scale of what this letter is.

15   Q.   You had mentioned earlier, agent, that you are firearm

16   trained; is that correct?

17   A.   I have received firearm training, yes.

18   Q.   And I believe while you may not necessarily be an expert in

19   the firearm capabilities of the weapon that was seized in this

20   case, are you familiar, from your training and experience, as

21   to the capacity of the firearm that was seized on the fence

22   line in this matter?

23   A.   The fact that it was a rifle, yes.

24   Q.   Okay.  And are you familiar, from your training and

25   experience, whether that is a firearm that could strike a

1  target at a far distance?

2  A.  I am aware that a rifle has a great distance that it is

3  effective up to.

4  Q.  And in your training and experience, does the use of a

5  scope on a firearm allow a firearm's user a greater ability to

6  hit a target at a far distance or a lesser ability to do so?

7  A.  A scope typically should give you a greater ability.

8  Q.  I know you were reluctant earlier to estimate the distance

9  between the fence line and the fifth hole on the Trump

10  International Golf Course, correct?

11  A.  Correct.

12  Q.  I want to ask you about the distance between the fence line

13  and the putting green on the sixth hole.  Okay?

14          Did you go to Trump International and view the scene?

15  A.  I did.

16  Q.  Did you have an opportunity to closely examine with your

17  own eyes the distance between the fence line where the

18  individual was seen by the Secret Service agent and the green

19  on the sixth hole?

20  A.  Yes, I was able to see that distance.

21  Q.  Okay.  Before I ask you to estimate for us that distance,

22  let me ask you this.

23          Were there any tree lines or bushes -- I think you

24  might have mentioned earlier that there was a line of bushes

25  that was located between the fence where the individual was

 1    seen that the Secret Service agent fired upon and the sixth

 2    hole; is that right?

 3    A.  Yes.  There is another line from east to west of bushes

 4    from that fence line.

 5    Q.  So that would have been between the sixth green and the

 6    fence line, correct?

 7    A.  Correct.

 8    Q.  And did you have an opportunity when you went to the scene

 9    to look at that line of vegetation?

10    A.  Yes.

11    Q.  Was there a portion of that line of vegetation between the

12    fence line and the sixth green that had a noticeable opening

13    that contained less vegetation than other areas along that

14    line?

15    A.  Yes, there was.

16    Q.  Okay.  And where was that line in relation to where the

17    Secret Service agent reported that he saw the individual with

18    the rifle on the other side of the fence?

19    A.  From the vantage point of generally where we found the

20    firearm, the rifle that was laid up against the fence, that

21    vantage point was relatively more open compared to a lot of

22    other parts of that brush line, if that's what you are

23    referring to.

24    Q.  Yes.  Okay.  So did you have an opportunity to go down to

25    the fence line where the individual with the rifle was reported

1    to be, had to have been located, and look directly to the hole

2    on the sixth green?

3    A.  Yes.

4    Q.  And was your obstruction, even if -- well, let me ask you

5    this.

6          Did you bend down to a low vantage point to determine

7    whether there was any obstructions to your ability to see the

8    sixth green?

9    A.  I did bend down and saw the vantage point from a lower

10   angle, yes.

11   Q.  Were there any obstructions to your view of the sixth hole

12   from that vantage point?

13   A.  It was generally an open view.  There may have been one,

14   like very minimal on, like, twigs or leaves, but nothing that

15   would obscure or view of the hole.  You were able to clearly

16   see the flagstick on the hole.

17   Q.  Based on your training and experience in firearms as well

18   as your familiarity with this type of weapon, would there have

19   been any obstructions to the ability of a person to fire a shot

20   from that fence line to the sixth green from the vantage point

21   that you observed?

22   A.  Based on my experience with firearms, I do not believe

23   anything would have obstructed.

24   Q.  And how far would you estimate that the sixth green, the

25   putting green on the sixth hole, was located from the fence

1    line where Mr. Routh was allegedly perched at the time he was

2    fired upon by the Secret Service agent?

3    A.  I mean, it would be an estimate.  I do know that we will

4    have an official, like, at a later date.

5         If I was going to ballpark it, give an estimate,

6    100 feet.

7    Q.  So about 100 feet?  About 33 yards or so?

8    A.  Roughly.  That's an estimate.

9    Q.  Now, as you walked along -- by the way, how tall was the

10   vegetation that was between the fence line and the sixth hole?

11   How high were those -- was that vegetation?

12   A.  It was different at different points along the fence line.

13   Some were head height, some were a little lower, some were tall

14   like trees, I believe, from my recollection.  But at that one

15   point there was an opening.

16   Q.  And as you walked 10, 15 yards or so to the east of that

17   opening and 10 to 15 yards or so to the south -- I'm sorry, to

18   the east of that opening, were there any other openings like

19   that anywhere in that area that you saw?

20   A.  Generally speaking, it was mostly blocked.  It would have

21   been a blocked view going that way, going each way 15 or

22   20 feet, for the most part.

23   Q.  Just so that the judge has a clear understanding, there is

24   also heavy vegetation on the opposite side of the fence, the

25   side that Mr. Routh was allegedly perched; is that right?

1   A.  That's correct.

2   Q.  Are you familiar with the area along Southern Boulevard

3   looking towards Trump International?

4   A.  Summit Boulevard?

5   Q.  Summit Boulevard.

6   A.  Yes.

7   Q.  Okay.  Is the fence line where Mr. Routh was allegedly

8   perched, can that be seen -- the fence itself, can that be seen

9   from Summit Boulevard, or does the vegetation block one from

10  viewing that fence?

11  A.  Generally speaking, most of it is blocked.  You won't be

12  able to see a fence from the street.

13  Q.  Defense counsel asked you about Mr. Routh's -- whether you

14  had uncovered any evidence that Mr. Routh has any firearm

15  certifications.

16          Do you recall that line of inquiry?

17  A.  I do.

18  Q.  I believe she also indicated, or she was questioning you

19  about whether he had any license of any kind?

20  A.  Correct.

21  Q.  In your experience as a law enforcement officer and in your

22  training with firearms, does a person need firearms

23  certification to know how to pull a trigger?

24  A.  No, they do not.

25  Q.  You mentioned that when the Secret Service agent first saw

1   the partial face of the individual on the fence line, there was

2   an initial greeting, I believe you described; is that correct?

3   A.  That's correct.

4   Q.  When did that initial greeting occur in relation to when

5   the Secret Service agent reported seeing the rifle sticking

6   through the fence?

7   A.  I am not sure on a time frame.  The sequence of events,

8   though, from my understanding, is the Service agent identifies

9   an individual and then after the greeting then notices that

10  there is a rifle, or a barrel sticking through the fence.

11  Q.  Did the Secret Service agent report whether once he saw the

12  firearm sticking through the fence, was there any more verbal

13  exchange between him and the individual on the other end of

14  that weapon?

15  A.  Not that I am aware of.

16  Q.  Now, you were also asked numerous questions about

17  Mr. Routh's social media accounts.

18  A.  Correct.

19  Q.  And I believe she had also questioned you about details

20  regarding the ballistic tests of the plates that proved to be

21  impenetrable by firearms used by the Secret Service.

22          Do you recall that?

23  A.  Correct.

24  Q.  Now, were you present during the ballistics testing?

25  A.  I was not.

```
1    Q.  So are you able to testify as to the details of how that
2    testing was done?
3    A.  No, I am not.
4    Q.  With respect to the social media accounts, you are able to
5    access publicly-available records on an individual's social
6    media account, are you not?
7    A.  I would be able to, yes.
8    Q.  Were efforts done in this case to do that?
9    A.  There was.
10   Q.  However, in your experience as a law enforcement officer,
11   social media accounts also contain a wealth of information that
12   is not necessarily available to the general public; is that
13   right?
14   A.  Typically speaking, yes.
15   Q.  And is law enforcement in the process of trying to obtain
16   social media accounts that belong to Mr. Routh?
17   A.  Yes, they are.
18            MR. DISPOTO:  One moment, your Honor.
19   BY MR. DISPOTO:
20   Q.  Just a few more questions, agent.
21            You were asked -- the government had proffered
22   initially, and you were asked on cross-examination, about how
23   long Mr. Routh was located in South Florida prior to
24   September 15th and what his reasoning for being here might have
25   been.
```

```
 1              Do you recall that?
 2    A.  Yes.
 3    Q.  As part of your investigation, were you able to uncover any
 4    information as to what Mr. Routh does for a living?
 5    A.  It's my understanding that he had done some work either on
 6    roofing or houses or tiny houses in the past.
 7    Q.  And in your extensive investigation in this case, has any
 8    one of your fellow law enforcement officers who is a member of
 9    this investigation team uncovered any information that
10    Mr. Routh was located here in South Florida during the month
11    preceding his arrest on September 15th for work purposes?
12    A.  I am not aware of any work purposes in the last month.
13    Q.  Are you aware as to whether Mr. Routh has any family that
14    lives here in South Florida?
15    A.  I do not believe so.
16    Q.  You are aware, though, that he does have family that lives
17    outside the State of Florida, correct?
18    A.  Yes.
19    Q.  Have you received any information as to whether Mr. Routh
20    during the preceding 30 months of being here in South Florida
21    was here for vacation purposes?
22    A.  In the past how long?
23    Q.  Thirty days.
24    A.  I am not aware of him being here for vacation purposes.
25    Q.  Now, you have also been questioned about cell site records;
```

1   is that correct?

2   A.  That's correct.

3   Q.  And am I accurate in saying that cell site analysis from

4   phone records that are provided by phone companies, those are

5   conducted by law enforcement agents who are trained to analyze

6   those records, correct?

7   A.  That's correct.

8   Q.  And typically agents who are so trained memorialize what

9   the records show in maps that show times and locations as to

10  where a particular cellular device is located on certain dates;

11  is that correct?

12  A.  That's correct.

13  Q.  And is there a process by which those documents or those

14  maps are not only prepared but ultimately reviewed and

15  finalized before being released to the parties?

16  A.  That's correct.

17  Q.  And is it your understanding that those maps in this

18  particular case are still being prepared and finalized?

19  A.  That's my understanding.  I am not aware of any finalized

20  reports.

21  Q.  Have you had an opportunity to review those maps prior to

22  coming into court?

23  A.  There's no finalized maps.

24  Q.  Okay.  Have you had a chance to review any drafts or

25  preliminary reporting regarding the location of Mr. Routh's

1    cell phones that was found from his vehicle?

2    A.  Yes.  To an extent, yes.

3    Q.  And I believe you told us that, and the government had

4    proffered, that those cell site records put him in the close

5    proximity to at least two places, Trump International Golf

6    Course and Mar-a-Lago, correct?

7    A.  Correct.

8    Q.  Now, the Mar-a-Lago location, I believe you testified that

9    it could have only been one time.

10   A.  Correct.

11   Q.  Do you recall when in relation to September 15th that those

12   records show that Mr. Routh's cell phone was located in the

13   area of Mar-a-Lago?  Would it have been the day of his arrest

14   or sometime before, if you know?

15   A.  It would have been sometime before, but I am not sure of

16   the date on that.

17   Q.  Okay.  Would it have been days, weeks, or a month, or do

18   you not know?

19   A.  I do not know.

20   Q.  Okay.  With respect to Mar-a-Lago -- I'm sorry.  Excuse me.

21        With respect to Trump International Golf Club, am I

22   accurate that there are multiple cell towers that are located

23   around the golf course that could be accessed by individuals

24   using their phones in those areas, correct?

25   A.  I am not sure where the towers are, but I know that there's

```
1    towers in the region that it would have pinged off of.

2    Q.  And do you know if Mr. Routh's phone accessed multiple

3    towers in the area of Trump International in the days and weeks

4    leading up to his arrest on September 15?

5    A.  We have multiple data locations in the weeks and days

6    leading up to the incident, yes.

7    Q.  And have you uncovered any information as to a purpose for

8    Mr. Routh to have been at that location other than with the

9    intent to assassinate the former President?

10   A.  I am not aware of any other.

11   Q.  Thank you very much.

12          MR. DISPOTO:  Your Honor, that's all the questions I

13   have.

14          THE COURT:  Thank you, agent.  You can step down.

15          (Witness excused)

16          THE COURT:  At this time I had previously admitted

17   Government's Exhibits 1 through 7 on a preliminary basis.  So I

18   will go ahead and admit them at this time permanently.

19          (Government Exhibits 1 through 7 received in

20   evidence.)

21          THE COURT:  Government, do you have anything else in

22   the way of evidence other than argument?

23          MR. DISPOTO:  One moment, your Honor.

24          We have no further evidence, your Honor.

25          THE COURT:  Defense, do you have any evidence other
```

1    than argument?

2              MS. MILITELLO:  Yes, your Honor.  We would like to

3    proffer some of the statements from Mr. Routh's book, if I can

4    do that.

5              THE COURT:  Sure.  Please.

6              MS. MILITELLO:  I have just my notes, but if the court

7    would accept the proffer from the same area of the book with

8    the quote that the government relied on in their proffer about

9    Routh writing he is taking blame for electing former President

10   Trump, but that he's "man enough to say that I misjudged and

11   made a terrible mistake."

12             In that same section in the book, he references

13   January 6th of 2001 and calls the Capitol insurrection a

14   "catastrophe perpetrated by Donald Trump and his undemocratic

15   posse."

16             He later wrote:

17             "Shall we let Taiwan fall?  We should encircle Taiwan

18   with military ships in support with military might.  If we

19   wait, such as we have done in Ukraine, it will be a ten-minute

20   war, and we will all be standing around like fools yet again."

21             In a separate section related to Ukraine he wrote:

22             "I presume that I must be clear, that while on the

23   current path Ukraine will not win, it is imperative for the

24   world that they do not win" -- I'm sorry, "that they do win,

25   and that is why this book is so important, for us all to

```
 1    recognize that losing is not an option and what we must do to

 2    win.  I obviously did not write this book to make any money, as

 3    that is totally unimportant; the extremely important issue that

 4    we openly discuss daily the major issues that face Ukraine and

 5    what we each must try to do to fix them.  This is a conflict of

 6    global importance and the outcome will affect us each and every

 7    one for the rest of the world.

 8              "It is tragic that we are too immature as leaders to

 9    be modest and humble and bend over backwards to forge

10    relationships.  If the world's leaders" -- I'm sorry.  "If we

11    are the world's leaders, we must be able to set the example of

12    how unselfishness and kindness and caring and be able to sit in

13    the dirt floor with the most common struggling souls among us

14    and share their pain and try to make their lives better."

15              That was the portion that Ms. Sihvola referenced that

16    we will proffer for the court.

17              THE COURT:  Thank you very much.

18              MS. MILITELLO:  We would also at this time admit

19    Defense Exhibit 1, which is a news article, which under the

20    rules would self-authenticate.

21              THE COURT:  Government, any objection to this?

22              MR. DISPOTO:  No objection.

23              THE COURT:  Defense Exhibit 1 will be admitted.

24              (Defense Exhibit 1 received in evidence.)

25              MS. MILITELLO:  I think I provided the court with my
```

1  unstapled copy, so bear with me.

2           THE COURT:  That's fine.  Do you need it back?

3           MS. MILITELLO:  The defense exhibit is from August 26,

4  1991, and it's a Greensboro news article related to an award

5  Mr. Routh won from the local police department where he fought

6  and chased a suspected rapist, later assisted police in their

7  investigation, and then was awarded a "Super Citizen award."

8           The article goes into detail about the physical fight

9  that he engaged in to restrain the suspect, and then also how

10 he later assisted the police in investigating their crime.

11 It's on page 2 of the filing.

12          At the bottom of the page I'd direct the court to the

13 quote from law enforcement that "it's rare that you find a

14 citizen that will go above and beyond to help police in

15 stopping the crime or the investigation of the crime."

16          This is the third page of the news report.  I direct

17 the court to the end where law enforcement said, "Frazier said

18 most citizens don't cooperate as well as Routh."

19          And the last page of the exhibit is a copy of the

20 original newspaper article, along with a photo.  It's difficult

21 to read, which is why we provided the print in a different

22 format.

23          THE COURT:  Thank you.

24          MS. MILITELLO:  We have argument, but those are the

25 only exhibits and proffer that we have at this time.

```
 1              THE COURT:  Thank you very much.  Let's proceed to
 2   argument.
 3              Government, you can go first.
 4              MR. DISPOTO:  Thank you, your Honor.
 5              Your Honor, the government submits that there are no
 6   conditions or combination of conditions that will assure the
 7   appearance of the defendant as required and the safety of any
 8   other person and the community.
 9              We begin, Judge, by citing the following factors set
10   forth in the Bail Reform Act at Section 3142(g).
11              First, the nature and circumstances of the offense
12   charged.
13              Judge, while the defendant here has been charged with
14   a firearms offense, which Congress has recognized in the Bail
15   Reform Act is a factor to be considered relative to the crime
16   charged and the seriousness of the crime charged, we would also
17   note that the nature and circumstances of this offense that
18   surrounds the charged crimes includes facts that show probable
19   cause to believe that the defendant also attempted to
20   assassinate the former President.
21              With respect to the weight of that evidence, I would
22   note, while the Eleventh Circuit has certainly recognized that
23   weight of the evidence is probably the least weighty factor,
24   because this is not a trial and there will be another time for
25   a complete vetting of all the evidence, the evidence in this
```

1    case that has been demonstrated through the government's

2    proffer is substantial.

3         The defendant's fingerprints is located on the tape

4    which fasten the scope to the firearm.  There are two witnesses

5    that put the defendant at the scene.

6         The photograph that your Honor saw in

7    Government Exhibit 2 clearly shows what I referred to before,

8    and the government maintains, is nothing short of a sniper's

9    nest where he set up two impenetrable ballistic plates close in

10   proximity to each other, low to the ground for him to use as

11   protection.

12        That is substantial evidence of his intent to pull the

13   trigger and to fire at the former President because he's

14   clearly taking precautions for return fire and for his own

15   protection.

16        The defendant fled the scene.

17        Cell site records demonstrate that Mr. Routh, who has

18   no ties here to Southern District of Florida, was here for

19   approximately one month prior to this incident and that through

20   the usage of his cell phones put him in the area of Trump

21   International as well as Mar-a-Lago during that period of time.

22        And finally, Judge, and probably most persuasively,

23   are his own writings.

24        Let me be clear, Judge.  The defendant has not been

25   charged in this case based on his dislike for President Trump

1   or his ideologies.  He has been charged because of his conduct;

2   specifically, the conduct that took place on September 15.

3         When you write a letter to the world referencing an

4   assassination attempt four months prior to -- or several

5   months, I should say, prior to when you are actually caught

6   perched outside of Mr. Trump's golf course with a loaded

7   firearm, I would submit to your Honor is substantial evidence

8   of his intent.

9         Whether he ever intended or not to offer or to pay

10  $150,000 to anyone who could finish the job, what's significant

11  is the fact that that's what he wrote, and that's the message

12  that he wanted to send to the world in advance of this

13  incident.

14        Your Honor, in addition to the nature and

15  circumstances of the offense charged, as well as the weight of

16  the evidence, I would point to the defendant's history and

17  characteristics; specifically, his prior criminal history.

18        According to the Pretrial Services report, the

19  defendant has an extensive criminal history.

20        In 2002, at the age of 36, he was convicted of

21  possessing a weapon of mass destruction in North Carolina.

22        THE COURT:  What was the weapon of mass destruction?

23        MR. DISPOTO:  That's what I was getting to, Judge.

24        If you look at Government Exhibit 7, specifically -- I

25  know these documents are not paginated, but if you go to page--

1    sorry, page 27, there is the actual indictment on the

2    possession of mass destruction charge.

3            Now, the indictment alleges -- does your Honor want me

4    to wait until you find it?

5            THE COURT:  No.  Go ahead.

6            MR. DISPOTO:  The indictment alleges that the

7    defendant willfully and feloniously did have and possess a

8    weapon of mass death and destruction; specifically, a binary

9    explosive device with a detonation cord and a blasting cap.

10           So that was the original indictment that was charged

11   in this case.

12           The defendant was ultimately convicted after a trial,

13   and he was sentenced to 15 to 19 months, with 60 months'

14   probation to follow.

15           The records also indicate that the defendant violated

16   his bond and his probationary conditions.  And you can find

17   that information on pages 1 and 4 and 24 to 25 of

18   Government Exhibit 7, and that he committed offenses while on

19   pretrial release for a different crime.  That's on page 32.

20           So the defendant has demonstrated in his past to be

21   committing -- not only committing substantial dangerous crimes

22   of violence, but also committing crimes while on court-ordered

23   supervision.

24           He's been convicted three times of possessing

25   worthless checks in 2002; three times for carrying a concealed

1  firearm in 2002; he's been convicted of identity card fraud and

2  resisting arrest in 2003; four counts of possession of stolen

3  goods in 2010; and 13 times he was convicted of driving with a

4  suspended license.

5  So clearly, Judge, this criminal history demonstrates

6  by themselves that this defendant is a recidivist and that he

7  has a dangerous past.

8  I would note that there does seem to be a pretty

9  substantial gap in his criminal history where, I believe, for

10  the past many years he has not been convicted of any offenses,

11  but that history, that, by the way, dates back to when

12  Mr. Routh received his accolades in 1991 for doing a good deed,

13  as the defense articulated for the court.

14  Furthermore, Judge, I would cite for the court's

15  reference that Mr. Routh has no community ties.  He doesn't

16  have any employment here.  He doesn't have any family here.  He

17  owns no property here.  He has no resources or assets that he

18  has reported to Pretrial Services.

19  He has ties to foreign countries.  By his own

20  admission to Pretrial Services he's been to Ukraine, which I

21  know the court is well aware is currently a war zone, and he

22  has also been to Taiwan.  He has demonstrated means to travel

23  internationally.

24  He does have some mental health issues, which is set

25  forth in a prior adjudication, where he was ordered as a

1   condition of probation to undergo at least a mental health

2   evaluation.

3        Lastly, Judge, the nature and the seriousness of the

4   danger to any person and to the community if released is

5   substantial, at the very least.

6        Your Honor, this is a high-powered rifle that the

7   defendant was in possession of on the date of his arrest.  With

8   the use of a scope and the estimated distance that the witness

9   gave with respect to the sixth hole on Trump International Golf

10   Course, this was an easy shot.

11        Former President Trump was on the fifth hole.  He was

12   approximately 12 to 15 minutes away from arriving at the

13   putting green on the sixth hole.  And as Agent Hull testified,

14   there was no obstructions to Mr. Routh's sniper's nest had he

15   pulled that trigger and shot at the former President once he

16   arrived on the green.  And with the use of the scope, I would

17   submit to the court that we can all imagine with that caliber

18   firearm how easy of a shot that that would have been.

19        The defendant has numerous prior convictions for

20   weapons offenses.  The facts as set forth in the government's

21   proffer clearly demonstrate a month-long plan to assassinate

22   the former President.  His own letters indicate clearly his

23   intent, as well as his efforts to get other people to carry out

24   his plan if in the event he gets caught.

25        Now that the letter that he gave to a civilian witness

1   in the box that the court has heard about, now that that letter

2   is out and by virtue of these proceedings, the defendant knows

3   that law enforcement now knows about that letter, I would

4   submit to the court that the civilian witness who turned over

5   that letter to law enforcement, who the defendant very well

6   knows who it is, is also at risk of retaliation if the

7   defendant was released.

8         The defendant has a history of ignoring law, and quite

9   frankly, Judge, it appears from all of the facts that have been

10  presented to the court that no conditions or combination of

11  conditions that this court could set would reasonably assure

12  his appearance as required and the safety of any person and the

13  community.

14        Based upon all the information that's been presented,

15  your Honor, the government asks that the defendant be held in

16  detention pending the resolution of these charges.

17        Thank you, Judge.

18        THE COURT:  Thank you very much.

19        Defense.

20        MS. MILITELLO:  As the court knows, in 1987, when the

21  U.S. Supreme Court reviewed the validity of the Bail Reform

22  Act, the court held that in our society liberty is the norm,

23  and detention prior to trial is the carefully limited

24  exception.

25        The charges before the court are charges without a

1    presumption of detention.  The government has not argued for a

2    presumption.  One does not apply.

3         While they are arguing that this case does involve

4    allegations outside of the complaint, I would remind the court

5    that no probable cause finding has yet been made.  We do not

6    have an indictment from a grand jury.  The court has not

7    formally made a probable cause finding at this time.

8         But even if the court found that probable cause

9    existed for the more serious charges discussed, the case law is

10   clear that danger in the instant offense does not create a

11   danger to the community per se or automatically.  Instead, the

12   government must actually show a danger to the community, and

13   here they failed to do that.

14        There is no evidence that Mr. Routh is a danger to the

15   witness that they have mentioned.  If anything, his history of

16   arrests and then complying with court orders shows otherwise.

17        Mr. Routh has over 100 arrests as an adult.  Of those

18   100 arrests, more than 70 are for traffic offenses, like

19   speeding, driving without a license.  There is a handful that

20   they mentioned for things like worthless checks.  And then

21   there's the two, of course, that are more serious, one being

22   stolen sinks, I think related to construction, and then the one

23   from 22 years ago involving some sort of explosive device.

24        But when you go through the pages and pages of

25   criminal history, what we find is only one failure to appear.

1    Mr. Routh appears for court, and Mr. Routh follows orders of

2    the court.

3           Mr. Routh, when looking at the 3142(g) factors and his

4    history, personal history and characteristics, the court will

5    find that he spent the better half of the last decade as a

6    law-abiding citizen, dedicated to making the world a better

7    place, working and providing for his family.  His children are

8    now adults, but he was supportive and living with his partner

9    and in contact with his two adult children in Hawaii the last

10   eight years.  Prior to that, he lived several decades in North

11   Carolina.  And so while he may not have community ties here, he

12   has extensive community ties to his communities in North

13   Carolina and in Hawaii.

14          He's a man who left his partner, his adult children

15   and family to fly across the world to Ukraine.  Part of that is

16   explained in the Pretrial Services report.  I know the agent

17   didn't know much of the details, but it's clear that he at

18   least intended to assist the war effort and to assist

19   Ukrainians in fighting for democracy.  He then, or perhaps the

20   timeline is a little unclear, flew to Taiwan in an effort to

21   help that country maintain their sovereignty.

22          He's a man who has volunteered his services with

23   Homemade Hawaii, which is a nonprofit helping homeless persons.

24   There is a record from our contacts with the family of him

25   using his construction to help communities, whether it's park

1    projects or building a dock in Hawaii, like a boat dock.

2          One family member described him to us as someone who

3    would give you the shirt off his back if you needed it.  Of

4    course, the court saw Defense Exhibit 1 from the early '90s

5    where he was hailed as a super citizen, if not a superhero.

6          His three adult children still love and support him

7    even after this arrest.  And along with his brother and sister,

8    he has a number of other family members and friends who have

9    reached out to us and are continuing to show their support.

10         We did not ask those individuals to come today because

11   of the media and the press.  These individuals have essentially

12   cut themselves off from the world.  Media has appeared at their

13   houses, at their homes, at their vehicles.  They have received

14   spoof phone calls.  They have received threats.

15         If the court is willing to adopt our bond proposal, we

16   can have them available to testify by phone.  But that's why I

17   am not going to be too detailed with their names or who they

18   are at this time.

19         THE COURT:  I understand.

20         MS. MILITELLO:  So while we agree the government's

21   permitted to seek detention based on risk of flight and

22   possession of the firearm, there is no presumption.

23         When we look at the criminal history, as I mentioned,

24   the most recent arrest is ten years ago, 2014, and all of the

25   rest, there's no history of violence, there is no history of

1    firearm convictions.  Many of the offenses related to speeding

2    are not criminal offenses in the State of Florida.

3         Importantly, when looking at the 3142(g) factors,

4    Mr. Routh was not on supervision, or violating bond, or any

5    other community sanction.  That's a separate subsection the

6    court is to look to when determining whether bond is

7    appropriate, and that does not apply here.

8         As it relates to facts about this case, as the court

9    heard, of course no shots were fired.  There is no direct

10   evidence that Mr. Routh ever actually touched the firearm.

11   There is evidence that it moved, but it's unclear how it moved,

12   if the individual that was seen may have touched the firearm

13   with his foot, with the bag, with the sausages.  We don't know.

14        Certainly what was left at the scene is the

15   unsophisticated and sort of untrained behavior of an

16   individual.  We have a rifle with duct tape or electrical tape.

17   It's been outfitted with a scope.  While the government has

18   sort of made these grandiose statements about it looking like a

19   sniper nest or something you'd see in the movies, I would

20   submit to the court we don't typically see duct tape and

21   electrical tape used on old guns in the movies, nor do we

22   typically see movies where snipers are resting their firearms

23   on the ground.  And that is what is before the court here

24   today.

25        Now, the letter that's been provided to the court of

1    course does not contain a signature.  It doesn't appear to

2    contain Mr. Routh's name.  No handwriting analysis has been

3    conducted at this time.  As Ms. Sihvola mentioned in her cross

4    several times, it seems to indicate multiple times an intent to

5    fail.  In other words, we don't know that there's actually an

6    intent to assassinate the former President.  Perhaps this is

7    more of a publicity or stunt than anything.

8         And I direct the court to the portion where the letter

9    states:  "I hope that at least my failed attempt may at least

10   make a few people stop and think for a moment how wonderful

11   freedom and democracy is."

12        Mr. Routh was cooperative with law enforcement in this

13   case.  He followed all of their commands.  He did not resist.

14   He was not violent with them.  He did not flee from law

15   enforcement.  In Martin County, he did not put anyone in danger

16   on the highway.  And that is consistent with his lengthy

17   criminal history, where we do not have any sort of violence

18   with law enforcement.  We don't have any sort of resisting or

19   failing to appear for court.

20        Our bond proposal is a $250,000 personal surety bond,

21   cosigned by his sister, who is an attorney licensed, admitted,

22   and in good standing in the State of North Carolina, and then

23   also cosigned by one of his adult children in Hawaii, who also

24   is gainfully employed.

25        The sister is willing to house Mr. Routh at her place

1    of residence.  She also owns a secondary property, but for now

2    I think the most proper place would be her residence, on a GPS

3    monitor.

4            The court could put him on home confinement, order a

5    mental health evaluation, and any recommended treatment.  In

6    addition to what might be available through Pretrial Services,

7    the sister is willing to look at private inpatient options or

8    private outpatient options and pay for that herself.

9            I'd remind the court, of course, that Mr. Routh's

10   passport and his driver's license, which are in his name, not

11   in any fake name or false name used to evade law enforcement,

12   but those properly-issued documents are now in the possession

13   of the United States government, which would make both

14   interstate or international travel difficult, if not

15   impossible, particularly from North Carolina, which does not

16   border any other country or the ocean.

17           These strict conditions with reputable family members

18   would mitigate any risk that might otherwise be present in this

19   case and we'd submit to the court would allow the court to

20   release Mr. Routh on the least restrictive conditions available

21   and would "reasonably assure his appearance in court and the

22   safety of the community."

23           The Bail Reform Act does not require a guaranty, and

24   we think these conditions are sufficient.

25           THE COURT:  Thank you very much.  Thank you for the

1    outstanding presentations by both sides in this case.

2         I am going to grant the government's motion for

3    pretrial detention.  I find that the government has met its

4    burden of proving that there are no conditions or combinations

5    of conditions that will reasonably assure the appearance of

6    this defendant as required and as well as the safety of the

7    community.

8         I will enter a written order that details my findings,

9    but in summary, I find that the weight of the evidence against

10   the defendant is strong as to the charged offenses.  In

11   particular, there was eyewitness testimony that placed him near

12   the scene of the rifle in question.  Also, there's a

13   preliminary fingerprint of Mr. Routh on the rifle in question.

14        If convicted on those offenses, he faces a substantial

15   period of incarceration, of course giving him an incentive to

16   flee.

17        The government has also proffered a great deal of

18   evidence regarding additional offenses which carry even greater

19   penalties, giving him an even greater incentive to flee.

20        I am persuaded by the fact that at the time of his

21   arrest he had his passport with him and a cell phone apparently

22   that had a Google search regarding how to leave Palm Beach, and

23   Miami as well, and go to Mexico.

24        The defendant also has, as reflected in the Pretrial

25   Services report, recent travel to the Ukraine and Taiwan,

1    which, as the government pointed out, shows skill in crossing

2    borders and, again, I think creates a risk that he will not

3    appear.

4            As to the danger to the community, I find that the

5    charged offenses itself poses a risk of danger based on the

6    nature of the firearm, but, more significantly, this

7    defendant's past history also poses a danger, particularly the

8    past conviction of possession of a weapon of mass destruction,

9    which apparently was some type of bomb.

10           Also, of course, I find very significant the

11   substantial evidence that the government has proffered here

12   today regarding this defendant's apparent efforts to stalk

13   former President Donald Trump over a 30-day period in an

14   attempt to assassinate him.

15           That evidence includes cell phone location data, a

16   notebook indicating the former President's locations, as well,

17   of course, as the incident itself involving this rifle, not to

18   mention a handwritten note recovered from a box that Mr. Routh

19   provided to somebody in North Carolina that states this was an

20   assassination attempt on Donald Trump.

21           So for all of these reasons I find the government has

22   met its burden necessary for me to grant this motion for

23   pretrial detention.

24           Government, is there anything else?

25           MR. DISPOTO:  No, your Honor.  Thank you.

1          THE COURT:  Defense, recognizing that you disagree

2     with my ruling, is there anything else we need to cover?

3          MS. MILITELLO:  Not at this time.

4          THE COURT:  Stephanie, do we need to cover anything

5     procedurally?

6          THE DEPUTY CLERK:  No, Judge.

7          THE COURT:  Thank you, everyone.  We will be in

8     recess.

9          (Proceedings adjourned at 1:56 p.m.)

10               C E R T I F I C A T E

11     I hereby certify that the foregoing is an accurate

12     transcription of the proceedings in the above-entitled matter.

13

14     September 23, 2024        /s/ Jill M. Wells
                                 Jill M. Wells, RMR, CRR, CSR
15                               Federal Official Court Reporter
                                 701 Clematis Street
16                               West Palm Beach, FL 33401
                                 jill_wells@flsd.uscourts.gov

17

18

19

20

21

22

23

24

25